No. 12,360.

Electrical Products Corporation of Colorado *v.*
Mosko et al.
(297 Pac. 991)

Decided March 16, 1931.

Messrs. Grant, Ellis, Shafroth & Toll, Mr. C. Russell Shetterly, for plaintiff in error.

Mr. D. H. Morris, for defendants in error.

*In Department.*

Mr. Justice Hilliard delivered the opinion of the court.

The plaintiff in error, plaintiff below, brings error to review a judgment of $77.94 in its favor, claiming that it was entitled to a greater sum. The plaintiff is the assignee of a California corporation of similar name, and the question presented concerns the interpretation and validity of a contract entered into between its assignor and the defendants for the construction and use of an electrical advertising sign made of glass tubing and filled with neon gas.

The contract was entered into between the defendants and a salesman of the plaintiff's assignor on July 11, 1927, and approved and accepted by the corporation, apparently in California, on July 16, 1927. The sign was built and erected at the defendants' place of business in Denver on August 17, 1927. The contract provided for 36 monthly payments, called rental, of $21 each, payable in advance on the first day of each calendar month after the erection of the sign, except for the payments due for the last two months of the term which were paid in advance, and except for the rental due for the period August 17, 1927, to August 31, 1927, which proportionate sum was paid when the sign was installed. The defendants made payments at rather irregular intervals in the months ensuing until May 12, 1928, when the last was made. On June 29, 1928, demand was made for the rental past due or for possession of the sign, in accord-

ance with the provisions of paragraph ''j'' of the contract, hereinafter set forth in full. The balance then due over the whole term was $610.90.

The contract is in form a lease and adopts the terminology employed in leases of real estate; the plaintiff's assignor is called the ''lessor,'' the defendants the ''lessee,'' and the payments ''rentals.'' It provides the lessor is, at its expense, to make and erect the sign, reading ''Used Cars,'' according to certain dimensions and directions annexed to the contract, and likewise to service and keep the same in repair during the term of the lease. The sign remains the property of the lessor at all times and on the expiration of the term or extension thereof the lessor may remove it. Paragraph ''j'' reads:

''(j) In the event that the Lessee shall be in default in the payment of any of the installments of the rental herein provided for, or shall breach any of the terms or conditions hereof, or in the event of the happening of the contingency provided for in subdivision (z) hereof, or should Lessee at any time become insolvent or should a voluntary or involuntary petition in bankruptcy be filed with respect to Lessee, or should a receiver be appointed for Lessee's business, the Lessor may, at its option, upon two (2) days' notice to the Lessee, which notice shall conclusively be deemed sufficient if mailed or delivered to the premises where the sign is then located, declare the balance of the rental herein provided for to be forthwith due and payable, and in such event such balance shall be immediately due and payable, and the Lessee hereby agrees to pay such balance upon such contingency. Time is of the essence of this lease with respect to the payment of the rentals herein provided. Should Lessor declare the balance of the rentals due and payable as in this subdivision provided, it shall have the right thereupon to take possession of the said sign and hold it until such balance shall be entirely paid. When the full amount of rentals shall be paid as in this subdivision provided, plus any expenses incurred by the Lessor in caring for the

sign during the time Lessee has been in default, Lessee shall be entitled to the use of the sign under all the terms and provisions hereof for the balance of the term of this lease.''

■ It is undisputed that the defendants were in default by reason of their failure to make the payments specified; that notice was given them as required by paragraph ''j''; that the sign was removed or repossessed by the plaintiff on July 3, 1928; and that the plaintiff had the sign in its possession and was holding it for the defendants as contemplated by the contract, at least when suit was commenced on July 9, 1928, and trial had on January 10, 1929. The sole question is one of law, as was conceded by both parties below in severally moving for directed verdicts and leaving the matter for decision to the court.

The position of the defendants is that the contract is void because it imposes a penalty or forfeiture having no reasonable relation to the damages suffered by the plaintiff, while the plaintiff contends that no forfeiture is involved and that full consideration flowed to the defendants for the $610.90 demanded.

■■ The transaction is to be classified as a bailment for hire. *Standard Oil Co. v. Dolgin,* 95 Vt. 414, 115 Atl. 235. In such bailments, as is stated in substance in *Warth v. Mack* (C. C. A. 2), 79 Fed. 915, where the bailor resumes possession of the hired chattel before the end of the agreed period the bailee is liable only pro tanto for payment of the hire, but he may agree to terms that will compel him to continue payment under any circumstances. Broadly speaking, it seems to us that the case at bar presents a situation where the defendants have by valid terms made themselves liable for the entire rental provided in the contract.

The analogy between the contract and a lease of real estate is frankly admitted by counsel for plaintiff, as is the general rule in such cases that where the landlord reenters and retakes possession, future rent cannot be

collected because of the consequent failure of consideration, and this point is stressed by counsel for defendants. But the plaintiff insists that many other considerations accrued to the defendants which distinguish this agreement from a lease of realty and summarizes them thus: 1. The sign was made specially for the defendants and is of no use to the plaintiff, as neither the sign nor the materials of which it is made can be sold or reused. 2. The retaking of the sign, even if it could be sold to another, destroys the plaintiff's outlet for a new sale with full profits. 3. The plaintiff has paid all the costs of installation of the sign. 4. Defendants are granted the use of a patented article. 5. The plaintiff is obligated to keep the sign serviced and repaired.

As to the fourth of these we must, upon this record, say that it is unfounded, for while the use of a patented article may be involved, there is nothing in the pleadings or testimony to indicate that such is the fact. The other four considerations we believe to be substantial and sufficient. True, the defendants insist that the sign simply reading "Used Cars," it may with readiness be resold to another used car dealer, of whom the defendants seem to believe there is plethora, but we cannot overlook the fact that the sign was made according to specifications proposed by the defendants, that the plaintiff retained it in its possession as required by the contract, and that the defendants covenanted "that the sign is especially constructed for the lessee." It is conceivable, of course, that another used car dealer might use the sign, but there is nothing before us to show that such a dealer exists with whom the plaintiff could safely deal from a credit standpoint or whose needs would be satisfied by a sign of the dimensions, shape, color and method of application to the building of the one here involved.

As to the right of the plaintiff to retake and keep the sign without selling it or otherwise endeavoring to mitigate its damages, we think the argument that it is entitled to have the market left open for new sales with full

452

profit has merit. One who has a parcel of real estate cannot multiply it. If he retakes possession he has regained usually the full consideration for which he parted with it. But one who manufactures an article capable of infinite production destroys new outlets with full profits when he reclaims and resells his products. Then, too, we must consider the duty imposed upon the plaintiff to keep the sign in readiness for redelivery if and when the defendants pay the balance of the rentals.

[4] It is plain that the other two considerations mentioned do not fail. The cost of installation has already been paid by the plaintiff and the retaking of the sign has not repaid it. The obligation to service and repair the sign continues. The fact the defendants failed to keep their agreement to pay, which in turn required the plaintiff to retake and keep the sign, does not destroy this duty. The plaintiff must keep the sign in proper condition for redelivery and once redelivered must continue the service to the end of the term.

■ The cases chiefly relied upon in the briefs are *Lamson Consolidated Store Service Co. v. Bowland* (C. C. A. 6), 114 Fed. 639; *In re Caswell-Massey Co.* (D. C.), 208 Fed. 571; *In re Miller Bros. Grocery Co.* (D. C.), 208 Fed. 573; *In re Miller Bros. Grocery Co.* (C. C. A. 6), 219 Fed. 851; and *Lamson Co. v. Elliott-Taylor-Woolfenden Co.* (C. C. A. 6), 25 Fed. (2d) 4. These cases involve contracts in terms similar to the one at bar, and show the history of the endeavor of the Lamson company, manufacturers of carrier devices leased or bailed for use in retail stores, to draw a contract to protect what it conceives to be its rights. In all these cases, save the last, the contract was, either in the trial court or on appeal, held to be obnoxious because entailing a forfeiture. Plaintiff here contends the Elliott case to be decisive, the defendants the Miller Brothers case.

The contract in the Elliott case is, so far as paragraph "j" is concerned, almost identical with the one here in issue. It differs in this, that where it provided for a re-

taking and termination of the lessee's or user's rights with a credit allowed the user of 20 per cent of the remaining unpaid installments, the contract at bar allows no such credit or any credit, but does not terminate the lease and requires the lessor to retain the sign and redeliver it upon payment of the rentals. The contract in the Bowland case did not provide for retaking *and* precipitation of the remaining unpaid rentals, and it was held accordingly that the Lamson company could have one but not both such rights. The Miller Brothers contract was found bad for substantially the same reason, and probably as a result of that and the former adverse decisions, the Lamson contract was reformed to provide both such rights cumulatively, as well as to provide the credit above referred to, and which was not allowed in the former agreements. In the Elliott case, at page 6, the Circuit Court of Appeals says:

"The contract in this case carefully specifies considerations which might not be completely made good to the owner until the last quarterly payment is received. These are (a) the cost of installing; (b) the license to use under patents; (c) the free supply of parts for repairs; and then (d) generally, the right to operate the system. For all of these things the user agrees to pay a total sum, divided into installment payments. We may well assume that the original cost of making the sale of such a system and system rights, and also the cost of installation, may be large. The value of the granted patent licenses is indefinite, and the extent of such existing licenses has an effect upon the value of the patents themselves. The obligation to furnish repair parts must be made good by the present and continuing maintenance of a stock of repairs. In addition, it appears without dispute in this case (as the court in the Miller Case for lack of convincing proofs was unwilling to assume), that the system, for the purpose of tearing out of the building and restoring to the owner, is worthless. If parts are removed with such care that they can be used elsewhere, it costs more to pay the

necessary skilled labor therefor and for refinishing them than it would to make new parts; and, if the parts are torn out cheaply and carelessly, they are junk, worth less than even that removal cost. Hence it seems probable enough, if not certain, that a provision for precipitating future payments, even after reclamation, is necessary for the protection of the owner. Of course, it may work hardship to the user and excess profit to the owner in some cases, but that does not make it so generally arbitrary and in the nature of a mere forfeiture as to destroy its validity.''

And, at page 7: ''Upon this record we see no reason why this contract, considered broadly as one which expressly permits both a retaking for the user's default, and a precipitation and collection of the future payments, should be condemned as necessarily invalid because involving a penalty or forfeiture. A material part of the distributed investment cost had not been repaid, and was not recovered by the retaking; the property retaken is of little if any value to the owner; a presumptively fair allowance is made to the user to cover reasonable values or savings secured to the owner by the retaking; and the owner is entitled to separate, full profits from as many systems as he can place. When competent parties, dealing as strangers, have provided for stated damages, on default, and the damages are made proportionate to the extent of the default, and probably approximate the actual damages, no reason is seen for defeating that contract.''

The Elliott decision is so persuasive that we may well follow it. We are not unmindful, in this respect, that it is said in that case (page 7) that ''Perhaps an attempt to collect the full amount of future payments without reduction to their present value, and without taking into account the future maintenance which the owner escaped, would have an aspect of forfeiture.'' The answer to that distinction is that here the plaintiff has done even more than the Lamson company contracted to do. That

company terminated the Elliott lease and took the property irretrievably. Here the plaintiff has not terminated the lease and was ready and, for aught in the pleadings or the testimony to the contrary, willing and eager, to return the sign and complete its obligations. The failure of the defendants to carry out their covenants furnished the sole reason for the retaking of the sign. That should not prevent recovery by the plaintiff where the sign "is of little value to the owner" and the owner stands ready to return and perform. To get the very ultimate of performance on the part of the plaintiff the defendants have but to perform on their side, when they will get the sign and the value thereof for which they contracted. Not so in the Lamson contracts where the credit allowed can hardly be said to take the place of the carrier system, apparently greatly needed in stores contracting for it.

For these reasons, therefore, we are constrained to hold that a case of forfeiture has not been made out and that the damages sought by the plaintiff are not so arbitrarily arrived at as to destroy the validity of the agreement.

The judgment is reversed with directions to vacate the judgment previously entered and to enter judgment in favor of the plaintiff and against the defendants for $610.90, with interest at the statutory rate from July 5, 1928.

MR. CHIEF JUSTICE ADAMS, MR. JUSTICE CAMPBELL and MR. JUSTICE ALTER concur.