**REGIONAL ENTERPRISES, INC., a Washington corporation, Appellant,**

v.

**TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, a foreign corporation, Appellee.**

**No. 19979.**

United States Court of Appeals
Ninth Circuit.

Oct. 26, 1965.

Joe P. Delay, Delay & Curran, Spokane, Wash., for appellant.

William V. Kelley, E. Glenn Harmon, Witherspoon, Kelley, Davenport & Toole, Spokane, Wash., Clarence E. Galston, Joel Per, New York City, for appellee.

Before JERTBERG, DUNIWAY and ELY, Circuit Judges.

ELY, Circuit Judge:

Appellant, plaintiff below, is the assignee of certain rights of Shadle Center, Inc., which, on August 12, 1960, entered into a contract with Teachers Insurance and Annuity Association of America. It is upon this contract and succeeding related events that appellant based its claim. The contracting parties may, in the interest of brevity, be called Shadle and Teachers. In all pertinent transactions, Shadle was represented by, and acted through, one Brown, its president. Early in 1960, Shadle embarked upon the enterprise of acquiring 23½ acres of undeveloped land and erecting a shopping center thereon. Adjacent to the undeveloped property was an existing Safeway grocery store operated under a long-term lease agreement with Metropolitan Life Insurance Company, the owner of the land on which the store was situated.

In the spring of 1960, Shadle commenced the solicitation of prospective tenants and had prepared its form of lease agreements. It made a lease agreement with Payless Drug Store, a partnership, and shortly thereafter, in June of 1960, entered into a contract for the erection of a building for the occupancy of the drugstore to be followed by the construction of a shopping mall. The total cost was $2,450,000, for which Shadle required interim financing. It was intended that any short-term interim loan would be repaid from funds derived from a permanent long-term loan which would be sought and obtained.

Shadle, for the long-term loan, had entered into negotiations with Teachers, which, in April, 1960, had caused its mortgage lending specialist, one Jenson, to come from New York City to Spokane, Washington, and discuss the project with Shadle's president. The various aspects of the project were discussed in detail, and Jenson informed Brown that Teachers could not undertake to process Shadle's loan application absent a deposit by Shadle of $40,000. Thereafter, in July 1960, one-half of this amount was forwarded to Teachers, and fifteen days later, Shadle sent to Teachers ten major leases which it had made with tenants.

On August 11, 1960, Teachers notified Brown by telegram that its mortgage committee had indicated general approval of a loan to Shadle of $2,000,000 for a term of twenty-two years four months and at an interest rate of 6½ percent. On the following day, an agreement dated August 12, 1960, called a "letter of commitment," was received by Brown. He signed a copy of the letter and with it, on August 22, 1960, forwarded the additional $20,000 of the required deposit to Teachers. On September 8, 1960, the Old National Bank of Washington, relying upon Teachers' commitment for the long-term loan, made a short-term interim construction loan to Shadle of $2,-000,000 at an interest rate of 6½ percent. The commitment letter provided, in effect, that if Shadle performed its prescribed obligations on or before August 31, 1961, the deposit of $40,000 would be returned, and it continued, "but if you fail duly to comply herewith on or before August 31, 1961 (unless for certain conditions an earlier date is prescribed, then upon your failure to comply therewith on or before any such respective date) and without fault on our part, then the amount so paid as consideration for our agreements herein shall be retained by us in full satisfaction for our entering this Agreement and holding ourselves ready and willing to make the loan within the aforesaid time, and thereupon this Agreement shall become null and void."

The commitment letter required that Shadle submit all tenant leases to Teachers for the latter's approval. In Paragraph 2 of the agreement we read, "You agree to deliver, for our approval, the original leases described in the attached Schedule of Leases (Exhibit A), as well as all other leases covering portions of the center not included in our mortgage, including short form leases, existing amendments and any collateral agreements affecting the same. The original leases and other agreements shall conform in all details with the Schedule and shall otherwise be in form satisfactory to us. Evidence will also be furnished of authority of any corporate tenant (unless domestic) to do business in the state where the property is located. You further agree that after approval by us the said leases and agreements shall not be amended in any way without our consent nor rent collected thereunder more than one month in advance. The leases and agreements identified in Exhibit A shall at the time of closing be assigned to us by an instrument of assignment in form satisfactory to us."

The commitment letter also required that there be parking rights upon the adjoining property occupied by Safeway Stores, and the leases executed between Shadle and its tenants contained covenants to the effect that such parking rights had been arranged. It is clear, however, that as of March 29, 1961, reciprocal parking rights had not been arranged or defined between Shadle, Safeway Stores, and Metropolitan Life Insurance Company, Safeway's lessor.

An "inter-office memorandum" which bears the date of March 29, 1961, had been written by Teachers' legal counsel. It carefully analyzed the problems of the transaction from a legal standpoint and emphasized the writer's concern over the absence of reciprocal parking arrangements between Shadle and the owner and occupant of the adjoining property. A copy of the inter-office memorandum was, with a covering letter of Teachers' counsel dated April 11, 1961,

forwarded to Shadle's president. The covering letter reads:

"Dear Mr. Brown:

I am enclosing herewith a 19 page inter-office memorandum representing recap of the current status and analysis of the subject matter. The original has been submitted to Mr. Fisher of our office and upon response from him with respect to any of the business questions presented, I will so advise you. In the interim, I would appreciate your proceeding with the remedial action indicated in respect to legal questions presented.

After you have had an opportunity to consider the foregoing, please call the undersigned at any time."

Shadle's president made no response to the letter from Teachers' attorney, as he was expressly invited to do. On the other hand, he chose to ignore the communication, and in the following month obtained a twenty-year term, $2,000,000 loan from another lender at an interest rate which, being only 5½ percent, resulted in the borrower's saving of approximately $500,000. Teachers, not being informed by Shadle of its new arrangement, continued to write Brown for progress reports. Finally, in June 1961, Teachers was notified by Shadle in a letter that Shadle "felt it was necessary to negotiate a less burdensome arrangement." Shadle made no demand for the return of the deposit of $40,000, but it expressed its belief "that a portion of our $40,000 commitment fee should be returned." Teachers refused to return any portion of the deposit. Brown and two of his brothers formed the appellant corporation, the corporation took an assignment of Shadle's rights as against Teachers, and the suit was instituted in the court below.

Appellant sought recovery upon three theories as follows:

(1) That Shadle entered into its contract with Teachers because of fraud perpetrated by the latter and that consequently it should recover the full amount of its deposit;

(2) That Teachers, by the inter-office memorandum of March 29, 1961, demanded of Shadle acts which were impossible of performance;

(3) That if Teachers is entitled to retain any portion of the deposit, it should be only that amount which is fairly compensatory under the principle of *quantum meruit*.

■ The district judge properly dismissed the claim insofar as it was predicated upon the assertion that Teachers had been unjustly enriched and was limited to the retention of only that portion of the deposit which was fairly representative of the services which it rendered. Teachers rendered no service to Shadle which was not essentially a service to itself. It furnished a commitment letter which was of value to Shadle in the obtaining of interim financing, but the contract evidences a clear intent of the parties that the deposit was made, not to compensate Teachers for services rendered to Shadle, but to insure the performance of Shadle's obligations in good faith and to specify a certain sum of damage in the event of Shadle's breach of the contract. That the amount was to be refunded upon completion of the contemplated loan agreement negates the contention that it, or any part of it, was to constitute payment to Teachers for services which necessarily would have already been rendered at the time the refund would have been made. The district judge correctly concluded that it was without his power to supply to Shadle a remedy not contemplated by the contracting parties and opposed to specific contractual provisions which they themselves had made at arms length and which they were obligated to respect.

■ The trial was to a jury, which, in answer to one of two special interrogatories, determined that Teachers had not fraudulently induced Shadle to make the contract evidenced by the commitment letter. The determination is abundantly supported by the evidence, and there is no merit in appellant's contention that the District Court erred in its dismissal, prior to submission to the

jury, of two of the alleged grounds upon which the claim of fraud was based.[1]

Answering in the affirmative a second special interrogatory inquiring, "did the defendant [Teachers] impose conditions on the plaintiff's assignor Shadle Center Inc. in connection with the processing of the loan involved in this case which were impossible of performance?", the jury returned a general verdict in favor of Shadle's assignee assessing damages in the sum of $19,500. Both parties filed motions for judgments notwithstanding the verdict, the appellant contending that the District Court should, in the light of the jury's answer to the second special interrogatory, enter judgment in its favor for the full amount of the deposit, namely, $40,000, and Teachers contending that the evidence was insufficient to support a verdict for Shadle's assignee in any amount whatsoever. Appellant's

motion was denied, and Teachers' motion was granted. This appeal followed.

If impossible conditions were imposed upon Shadle, they were imposed by the inter-office memorandum submitted by Teachers' counsel under date of March 29, 1961 and the covering letter with which Teachers' counsel forwarded a copy of the memorandum to Shadle's president. Appellant does not contend that Teachers presented other demands for impossible action, either orally or in writing. We have already quoted the cover letter. The inter-office memorandum consists of nineteen pages. There are seventeen numbered paragraphs, some of which contain numerous subparagraphs. Appellant specifies paragraphs 6 and 7 as those which contain the objectionable "demands." Both paragraphs are set forth in full in the footnote below.[2] They contain comments

---

1. The two dismissed grounds were as follows:

(1) That Teachers had represented that the cost of necessary appraisal work would be $1500, whereas the eventual cost of the appraisal was $3600.

(2) That it was represented that the mortgage lending specialist Jenson would be in exclusive control of the processing of the loan on behalf of Teachers, whereas in the course of the negotiations two other representatives of Teachers succeeded to Jenson's responsibility.

The district judge stated, as his reasons for the rejection of these particular claims of fraud, the following: .

"I don't think there is any clear, cogent and convincing evidence that there was fraud as far as the appraisal fee of $1,500 was concerned."

"Nor do I feel that there was any fraud in connection with the representation by Mr. Jenson that he would process the loan, because it stands to reason that he is an employee subject to dismissal by his superiors for insubordination, failure to perform, or anything else, and he might even die. I don't think anybody can guarantee a situation like that, that he is going to be permanent."

We agree.

2. "6. *Parking.* Under the terms of our commitment letter agreement, we have required that a paved parking area of 769,000 square feet at all times, in ratio

of 3.:1 with gross building area, be available within the *mortgaged premises.*

"In the most current plot plan attached to certain of the leases, the only reference to parking facilities is a car count of 1,-970 cars. Unfortunately, it is not entirely clear whether this car count includes the Safeway property (not included in our mortgage) or is of the mortgaged premises alone.

"It should be noted that there is indicated within the Safeway property a car count of 181.

"Under the leases examined to date the largest parking area required is in the Penney lease wherein a car count of 1,700 cars, together with a ratio of 3.25:1 with floor area, is required. The next largest parking area is in the Pay Less Drug Stores lease and in the Newberry lease, both of which require a car count of 1,500 and a ratio of 3.25:1 with rentable space. The Edison Shoe and Bank leases require specifically 1,500 cars. All such leases, however, refer to an attached plot plan of both the mortgaged premises and the Safeway parcel.

"In our mortgage, therefore, we will be obliged to include the largest of the foregoing parking requirements as an event of default in accordance with our customary procedure for shopping centers. The requirement will be 1,970 cars and a ratio of not less than 3.25:1 with floor area. This ratio incidentally in each of the cited leases is to be prorated upon

relating to a foreseeable problem of the parking of automobiles and suggest the need of a reciprocal parking agreement between Shadle, Safeway Stores, and

occupancy of such building areas and our mortgage ratio will coincide with this.

"In addition and in the event any subsequent lease shall contain requirement in excess of the foregoing, then such larger requirement shall prevail."

"7. *Additional Parking:* Under the terms of our commitment letter we have required a non-exclusive parking agreement over all portions of the Shadle Shopping Center as now or hereafter constituted, with a minimum ratio therein of not less than 3:1 (which ratio has been superseded by the lease ratio hereinbefore discussed). As you know, the mortgaged premises does not cover the entire Shadle Shopping Center. The portion of the center not covered by the mortgage is the building occupied by Safeway and certain parking area to the north and west of the Safeway building. This parcel is herein referred to as the Safeway property and is presently owned by Metropolitan Mortgage Company, although in some of the correspondence is referred to as The Metropolitan Insurance Company.

"Every lease in the center contains a reference to the Safeway property and includes this property in the various covenants affecting the 'shopping center'.

"The reference to incorporation occurs in various forms. For example, in the form lease under Article I-A, it is provided that 'a plan of the shopping center is hereto annexed as Exhibit A and is hereby made a part hereof'. This plot plan includes the Safeway premises. The lease further states that 'a metes and bounds description of the lands comprising the shopping center, the (tenants) portion thereof, and the Safeway portion *thereof* as hereto annexed as Exhibit B, B-1 and B-2 respectively. Article I-B, Section 1 of the form lease further provides 'In addition to the premises mentioned in Article I-A hereof, this lease includes the non-exclusive right to tenant * * * to use and enjoy throughout the term of this lease the "Common Areas" of the shopping center'. In addition, the J. J. Newberry lease includes substantially this same language, and more specifically the J. C. Penney Company lease requires that a parking agreement be executed with the *owner* of the Safeway property guaranteeing reciprocal parking rights over the life of the J. C. Penney lease.

"As mentioned previously, the Safeway parcel is owned by 'Metropolitan Mortgage Company' and is only leased to the Safeway Stores Company. The only

agreement I have seen, and apparently to which the Safeway Company will agree, is a draft of License Agreement, copy of which has been furnished to me. This Agreement is between Safeway Stores and Shadle, Inc. and provides merely for reciprocal ingress, egress and parking as between the two properties. It requires Shadle to remove the bumpers and obtain necessary permits. Each party agrees to indemnify the other for any personal injuries or property damage resulting from the Agreement and that neither will unduly hinder the other. The Agreement is to continue only so long as Safeway retains an interest as either owner or tenant in the Safeway property, and, upon the expiration thereof, the Agreement shall cease and Shadle shall restore the bumper curbs. In addition, the Agreement is not to be transferable or assignable by eitherparty [sic] without the consent of the other and is not to be considered as a deed or grant of easement or irrevocable.

"I have not been furnished with a copy of the Safeway Stores lease and have no idea as to the term thereof nor do I have any idea as to whether the entire 'Safeway property', of which we have been speaking, is in fact demised under the Safeway lease. There is, therefore, the obvious deficiency in any agreement in which Safeway only is the other party inasmuch as there is no certainty that the term of the Safeway lease, even including renewals thereof (which they are not obliged to exercise), will be sufficient in relation to the terms and renewal options under the leases within the mortgaged premises.

"The most serious deficiency is also a breach of the J. C. Penney lease where it is specifically required that any such Parking Agreement shall be obtained from the *owner* of the Safeway parcel which, of course, *is not true* in the submitted draft.

"Please note that the rights under the License Agreement are not transferable or assignable by either of the signatories. The privileges thereunder now extend insofar as tenants, customers and invitees of the parties to this Agreement but would not extend to any subsequent owner of the mortgaged premises including Teachers in the event of foreclosure.

"There is now no limitation on the size of the buildings, parking areas, additional buildings, etc. insofar as the Safeway property is concerned. Consequently, there may be unlimited expansion of any

the latter's lessor. Paragraph 7 mentions the absence of limitation "on the size of the buildings, parking areas, additional buildings etc. insofar as the Safeway property is concerned" and continues, "Consequently, there may be unlimited expansion of any of the buildings thereon, with the resulting adverse affect [sic] upon the required parking ratio and requirements under our lease, as well as from an aesthetic point of view. Unlimited building within the Safeway

of the buildings thereon, with the resulting adverse affect [sic] upon the required parking ratio and requirements under our leases, as well as from an aesthetic point of view. Unlimited building within the Safeway boundaries could completely obscure a portion of the balance of the center from the main street.

"I do not now know, but will confirm, that none of the utility lines connecting the mortgaged premises with the municipal or other public utility main lines run through the Safeway property. In any event, it should be noted that no such rights are granted under this agreement.

"Under the agreement, Safeway undertakes no obligation whatever to maintain light, remove snow, etc. for so much of the parking area located on its premises, nor does Safeway agree to contribute to the overall cost of maintaining the entire parking area, some portion of which would conceivably be utilized by its customers.

"In the event of condemnation or fire damage, there is no obligation on the part of the owner of the Safeway parcel to continue in occupancy.

"Although academic perhaps in view of the ownership and occupancy of the Safeway parcel, under the law of Washington a default in taxes and subsequent foreclosure would wipe out the pre-existing license agreement or, for that matter, any parking easement over the Safeway parcel. It then becomes absolutely important that some continuous check on the payment of taxes for the Safeway parcel be maintained with right and reasonable opportunity for easement-holders to cure any such default.

"One of the most serious consequences of the present arrangement is the fact that the Safeway premises could be used, assigned or sublet for a use in conflict with the existing exclusives in all other leases within the center inasmuch as all such exclusives refer to 'the shopping center', of which Safeway is an integral part. In order to obtain compliance with all such exclusives, it becomes necessary to encumber the Safeway property with such a restriction or else amend all existing exclusives in the mortgaged premises to limit the effect of same to the mortgaged premises alone.

"The license agreement provides no remedies except the inherent right of damages for breach of covenant. There is, however, no provision for injunction or self-help.

"Although the parties under the license agreement would agree to indemnify each other, there is no express provision for liability insurance, although the same is required under the various leases.

"The foregoing criticisms of the license agreement, we believe, represent serious deficiencies, conflicts and defaults in relation to the leases within the mortgaged premises. It is pointed out that each of the problems represented in these criticisms are reasonably remedied under the provisions of our customary declaration, which would be recorded against the entire center, including the Safeway property. The declaration would be in the form of a two party agreement which we have executed in quite a few instances in the past and has been quite workable. To be of any value whatever, however, the agreement would need be with the owner of each parcel rather than with a tenant thereof.

"I will, in due course, communicate with the sponsors as well as the Safeway Company, with whom we enjoy a very fine relationship.

"The difficulty is that it is not too easy to point up to the Safeway Company any additional advantages which will accrue to them by such an agreement since they have fairly well protected themselves by way of restrictions in the deed of our property.

"The type of agreement and declaration we have in mind would be recorded against the entire center and would have to be a first charge thereon. Any existing mortgage on the Safeway property would have to be subordinated.

"The description of the mortgaged premises in our mortgage would include all of the property owned by Shadle Center, Inc. and as well the rights created under such agreement and declaration. The title policy furnished to us would insure the priority of our mortgage on the Shadle Center, Inc. property and as well the priority of the parking agreement and declaration on the Safeway property."

boundaries could completely obscure a portion of the balance of the center from the main street."

Appellant contends that the language of the two paragraphs imposed upon Shadle additional and unreasonable obligations which were impossible of performance.[3] The contentions are untenable. Considered as a whole, the memorandum is a painstaking analysis of the legal problems incident, under the then status, to a significant commercial undertaking. Its author, while fulfilling his obligation to specify legal hazards which seemed important to him, nevertheless did not presume to direct the addressee, a Teachers official, as to whether the loan should or should not be made in the exercise of discretionary business judgment and in spite of the legal objections which he had put. The last two paragraphs of the memorandum read,

> "A copy of this memorandum is simultaneously being forwarded to the sponsors in order that we may co-ordinate our efforts in remedying any of the problems discussed above. In the interim, I would likewise appreciate receiving from you your comments in respect to any of the business questions raised herein which likewise will be forwarded to the sponsors.
>
> After all interested parties have had an opportunity to consider the foregoing, I will be pleased to discuss same with any of them at their convenience."

Looking to this language as well as to the closing sentence of the covering letter in which Shadle's president was told, "After you have had an opportunity to consider the foregoing, please call the undersigned at any time," we see that the documents, fairly interpreted, did not constitute a final demand upon Shadle for the performance of any action whatsoever. While Teachers' counsel informed Brown in the covering letter that he would "appreciate" Brown's "proceeding with the remedial action with respect to legal questions presented.", it is apparent to us, as it obviously was to the district judge, that further discussion of the objections raised and the problems, if any, which might be insoluble was intended and invited.

■ Appellants urge that Teachers, in issuing the memorandum, breached the contract by anticipatory repudiation and that for such reason, the deposit was unlawfully retained. The doctrine of breach of contract by anticipatory repudiation works harsh results, and for its application, there must be a "positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot substantially perform his contractual duties; * * *." Restatement, Contracts § 318 (1932). See Trompeter v. United Ins. Co., 51 Wash.2d 133, 316 P.2d 455, 461 (1957); McFerran v. Heroux, 44 Wash.2d 631, 269 P.2d 815, 821 (1954); Casey v. Murphy, 143 Wash. 17, 253 P. 1078, 1079 (1927). As we have remarked, the memorandum and its covering letter presented no final demands to Shadle. They contain no "positive statement" that Teachers "will not or cannot substantially perform [its] contractual duties."

■ The memorandum's contents, as well as its import, its origin, and its primary destination, constitute no substantial evidence of the intent of Teachers' authoritative business executives to repudiate Teachers' commitment or to

---

3. Even if it is assumed that Shadle's president, upon receipt of his copy of the memorandum, was reasonably justified in believing that it would be impossible to obtain a reciprocal parking agreement, it would seem reasonable that he should have explored the possibility or, at the very least, explained the basis of his belief to Teachers. The fact is that after Shadle made its agreement with the new long-term lender, a reciprocal parking arrangement involving the Safeway property was completed.

The reference in the memorandum's paragraph 7 to "an aesthetic point of view" cannot, by any stretch of language, lead to the whole paragraph's interpretation as a "demand" by Teachers that Shadle, in the language of appellant's brief, "control the color and demeanor of the Safeway Store."

impose new, unreasonable, or impossible conditions for Shadle's performance. Having reached this conclusion from a careful examination of the documents themselves, it becomes unnecessary for us to discuss the testimony which was given orally. Most of it was excludable under the parol evidence rule. The terms of the written contract with its amendments are so clear as not to permit of attempted variance by oral testimony. See, e. g., St. Paul Fire & Marine Ins. Co. v. Balfour, 168 F. 212, 215 (9th Cir. 1909); Restatement, Contracts §§ 237, 238 (1932); 4 Williston, Contracts §§ 631–32 (3d ed. 1961). Suffice it to say that the weight of the evidence points to the conclusion that Shadle, in the face of its contract with Teachers, saw an opportunity, by arrangement with a new lender, to effectuate a saving of $500,000 in interest payments. With business prudence which is perhaps commendable, it availed itself of the opportunity. Teachers, anticipating the possibility of successful competition, was protected by the provision for forfeiture of the deposit. The evidence discloses no just basis for refusal to enforce the provision.

The District Court properly determined that the evidence was insufficient to justify a verdict in favor of Shadle's assignee, and the judgment is

Affirmed.

Barnes, Circuit Judge, dissented.