**SHEL-AL CORPORATION, Plaintiff-Appellant,**

v.

**AMERICAN NATIONAL INSURANCE COMPANY and Exchange Security Bank, Defendants-Appellees.**

**No. 73-1965.**

United States Court of Appeals, Fifth Circuit.

March 25, 1974.

April 8, 1974.

Rehearing Denied May 8, 1974.

4. I agree with the majority's disposition of the other points raised by appellants.

William M. Acker, Jr., Ferris S. Ritchey, Jr., Birmingham, Ala., for plaintiff-appellant.

William A. Major, Jr., Drayton Nabers, Jr., Birmingham, Ala., for American National.

C. John Holditch, Birmingham, Ala., for Exchange Security Bank.

Before TUTTLE, GEWIN and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal stems from the failure of American National, a provider of permanent financing, and Shel-Al, a developer of an office building, to consummate a loan agreement. Appellant Shel-Al Corporation, an Alabama corporation, instituted this action in Alabama state court to recover a $24,000 cash deposit made to American National Insurance Company, a Texas corporation, and to enjoin the honoring of a $24,000 irrevocable letter of credit payable to American National by the Exchange-Security Bank, an Alabama banking association. The state court issued a temporary injunction prohibiting payment of the letter of credit. American National filed a removal petition in federal court, alleging that the co-defendant, Exchange-Security Bank, was a mere nominal party.

The district court granted summary judgment in favor of Exchange-Security Bank and dissolved the temporary injunction, thus permitting the letter of credit to be honored. American National also interposed a claim for interest on the letter of credit. The $24,000 cash deposit and the $24,000 letter of credit were a stand-by deposit fee paid to American National at the time American National and Shel-Al entered into a loan agreement, totalling $1,600,000.

The trial court entered judgment for American National on Shel-Al's claim which allowed American National to retain the $48,000 stand-by deposit fee and for American National in the sum of $1,872 on its counterclaim for interest on the letter of credit. Appellant Shel-Al argued that American National failed to perform its commitment to furnish permanent financing and in the alternative that the $48,000 deposit constituted a penalty and not liquidated damages, thereby entitling Shel-Al to a refund of its $48,000. American National contended, and the district court agreed, that the reservation of coal and other minerals and a covenant to save a prior owner harmless for damages resulting from mining in a deed in the chain of title of Shel-Al were material defects impairing the marketability of the land, that American National had requested a cure which Shel-Al had not furnished, that Shel-Al needing additional $200,000 mortgage money was unsatisfied with the original $1,600,000 financing plan, and that, therefore, American National was entitled to retain the $48,000 stand-

by fee as liquidated damages. We affirm.

## I. FACTS

The financing arrangement in controversy was to be executed through a sale-lease back transaction whereby American National would purchase developed real estate from Shel-Al for $150,000, and lease it back to Shel-Al and lend Shel-Al $1,450,000 secured by a mortgage of the leasehold estate. For simplicity, this transaction is referred to herein in the singular as the commitment.[1]

The tract in question was originally owned by U. S. Steel. In 1965, Basenberg purchased 6.5 acres of this land from U. S. Steel. In the deed of conveyance to Basenberg, U. S. Steel reserved the title to those minerals lying beneath the property but without the right to use the surface of the land conveyed and the deed included a damage release provision in favor of grantor for harm caused by future mining.[2] Contemplating construction of an office building at this site, Dube and Leider, the sole stockholders of Shel-Al, purchased 3.1 acres of the Basenberg tract and proceeded with development plans. When it became necessary to obtain permanent financing, Shel-Al engaged a mortgage broker, Mortgage Corporation of America (MCA), for a fee of 1 per cent of the total amount of the mortgage money that MCA might procure. MCA approached American National, as well as other mortgage companies. Ameri-

can National and MCA officials met and inspected the proposed building site.

On November 19, 1969, American National issued the purchase and loan commitment documents to Dube and Leider who accepted on behalf of Shel-Al. Certain amendments to these commitment documents were negotiated by correspondence in early December, 1969, which modified the manner in which the deposit was made ($24,000 cash and $24,000 letter of credit to become due if transaction not consummated, rather than $48,000 cash) and allowed 240 days for completion of the foundation rather than 180. At the time these modifications regarding the terms of the commitment were prepared, Shel-Al did not request modifications based on the problems relating to mineral reservation in the title. Although allegedly inexperienced real estate investors, Dube and Leider did have an attorney negotiate these other amendments to the commitment documents. The district court determined that the Shel-Al attorney was aware of the title defect at this time, but found that "it may or may not be that the principals [Dube and Leider] were aware of the title defect." Although American National had invested substantially in a shopping center less than one mile from the proposed building site and the chain of title to that property contained a similar reservation of mineral rights, the district court concluded that American National had no knowledge of the mineral reservation in Shel-Al's chain of title at this stage in the negotiations.

---

1. Although the initial commitment was made to Shel-Al's predecessor, Dube and Leider, Inc., both entities are referred to herein as "Shel-Al."

2. The clauses in the deed from U.S. Steel to Basenberg read:
   "Reserving and accepting, (sic) however, from this conveyance all the iron ore . . . and other minerals in and under said land, together with the right to mine and remove said iron ore . . . and other minerals without using the surface of said land; and also the right to transport through said land iron ore . . . and

other minerals from adjoining or other land without using the surface of the land hereby conveyed.
   \*     \*     \*     \*     \*
   "This conveyance is made upon the further conveyance and condition which will constitute a covenant running with said land, that no right of action for damages on account of injuries to the land herein conveyed or to any building, improvement, . . . hereafter located upon the said land . . . resulting from past or future operations of any nature of the grantor, its successors, assigns . . . shall ever accrue to or be asserted by the grantee . . . ."

The purchase commitment document provided that in consideration of $150,000 to be paid on or before November 30, 1970, Shel-Al would convey to American National the land on which the building would be erected. The commitment recited that Shel-Al must convey to American National *"good and merchantable fee simple title"* by a general warranty deed. (Emphasis supplied). After this conveyance, American National was to lease back the property and building to Shel-Al for a net rental of $18,000 per year. Shel-Al made a $4,500 refundable deposit with American National. A clause in this agreement provided that if all conditions of the commitment were not met, the deposit should be retained by American National as "liquidated damages."[3] This sale and lease-back in the purchase commitment were to be consummated concurrently with the closing of the loan.

The loan commitment document contemplated a closing date of November 30, 1970. As security for the loan and as a condition of closing, Shel-Al was to complete the building and obtain a sublease to Pennsylvania Life Insurance Company for a period of 27 years.[4] Upon the signing of the loan commitment, Shel-Al gave American National a deposit of $43,500, which in addition to the $4,500 deposit on the purchase commitment, made the total deposit $48,000. The loan commitment contained numerous requirements, including the requirement that Shel-Al have a valid leasehold estate in the premises. This condition could be complied with only if American National consummated the purchase and then leased back the building to Shel-Al. Similar to the purchase agreement, the loan document provided that if all conditions were not met, the $43,500 deposit could be retained by American National as "liquidated damages."[5]

Following the execution of these purchase and loan commitments between American National and Shel-Al, construction of the office building was commenced. In April, 1970, Shel-Al sought interim or construction loans, which were to be paid off by the permanent financing of American National. A title binder was sent by a prospective interim lender to American National for approval, so that the interim lender could be assured of being paid when the building was completed. This title binder reflected the reserved mineral rights and the damage release clause in the U. S. Steel conveyance. American National through MCA advised Shel-Al that these mineral exceptions presented a problem. The district court found that this was the first time American National was aware of the mineral reservation and damage clause. Shel-Al explained that U. S. Steel had reserved mineral rights extensively in Jefferson County, the location of the building site. After further correspondence, American National suggested three solutions: (1) Shel-Al should obtain a release or modification of the mineral reservations; (2) Shel-Al

---

3. Clause 15 in the purchase commitment document stated:

"At the time this agreement is accepted the Seller shall made a non-interest bearing deposit with American National of $4,500. In the event the purchase and sale are not completed in accordance with the terms of this agreement prior to the expiration of this agreement, the deposit shall be retained by American National as liquidated damages; otherwise, the deposit shall be returned upon the closing of this transaction. . . ."

4. Pennsylvania Life Insurance Company is a holding company which owns completely a number of corporations, including both Pennsylvania Life Insurance Company and Pennsylvania Life Insurance Company of California.

fornia. The two Shel-Al shareholders, Dube and Leider, were officers of that latter company, Pennsylvania Life Insurance Company of California, but were not officers of either the holding company or the life insurance company itself.

5. Clause 18 in the loan commitment document stated:

"At the time this commitment is accepted, the applicant shall make a deposit of $43,500 as a stand-by fee. In the event all the conditions and requirements of this commitment are not satisfied and the loan is not closed prior to the expiration of this commitment, the stand-by fee shall be retained as liquidated damages; otherwise, the fee shall be refunded upon the closing of this loan."

should obtain clear title insurance or casualty insurance; (3) American National might waive any objection to the reservation of mineral rights. American National officials informed Shel-Al that the final decision must be made by American National's Executive Committee.

All three possibilities were pursued by Shel-Al and MCA. There were negotiations to obtain a release from U. S. Steel from the last of April until the first of August, 1970. Shel-Al explored the likelihood of acquiring insurance, but concluded that the premium was exhorbitant. Hoping to prompt a waiver by American National, Shel-Al submitted a geologist's report reflecting that mining operations in the area had ceased. Shel-Al also sent American National some evidence of the custom and practice of lenders in the area concerning outstanding mineral reservations and damage release clauses.

Contemporaneously with the title controversy, Shel-Al considered the feasibility of adding another floor to the proposed five-story building. Shel-Al applied to American National for a $200,000 increase in the commitment. On May 22, 1970, American National took this issue of supplemental commitment money to its Executive Committee, which agreed to lend the additional amount. Another set of commitment documents was issued by American National which granted a $200,000 increase on the mortgage loan aspect, but required an additional stand-by fee of $2,000 and raised the interest rate for the entire commitment by ⅛ per cent. In August, 1970, Shel-Al expressly rejected this proposal stating that the increased interest rate and request for an additional deposit made it unacceptable.

U. S. Steel advised on June 1, 1970, that it would not release its mineral rights. On June 3 or 4, 1970, in behalf of Shel-Al, MCA wrote to American National that the matter must be resolved immediately. American National responded on July 13, 1970, that it would take the issue to its Executive Committee, but on July 14, 1970, American National received a letter from an agent of Shel-Al requesting a refund of the $48,000 deposit fee. The district court found that upon receipt of the July 14th letter American National's duty to take this matter to its Executive Committee was suspended until further developments. The district court concluded the July 14th letter placed the burden on Shel-Al to proceed with other possibilities regarding curing the title.

In July, 1970, Shel-Al approached Liberty National Life Insurance Company in Birmingham, Alabama, concerning the possibility of permanent financing for the same project, should financing not be forthcoming from American National. Approximately July 29, 1970, Liberty National advised Shel-Al that it would not issue a commitment unless Shel-Al terminated the American National commitment.

On August 4 or 5, 1970, Shel-Al advised MCA to stop all negotiations with U. S. Steel and American National. On August 17, 1970, Leider was still engaged in attempting to secure a refund from American National. During October, 1970, there were three conversations between Leider and an American National official, in essence, concerning the refund of the deposit and clarification of the stance of the parties in the matter.

The building was completed and in partial occupancy during the latter part of 1970. American National on December 7, 1970, informed Shel-Al that the commitments had expired by their own terms and that American National was retaining the $48,000 as "liquidated damages." Shel-Al financed the building on the 90 day personal notes of its stockholders until a permanent mortgage holder was located. Shel-Al paid $16,000 commission fee to MCA and $8,000 to an interim lender for a construction loan which was never consummated. Prior to trial Shel-Al attempted to amend its complaint to include a dam-

age claim, as well as the refund claim for $48,000, which was denied by the district court. The only issues appealed are whether the district court correctly concluded (1) American National properly raised objections to the mineral reservation and the damage release clause as a title defect and that American National demanded cure which was not furnished by Shel-Al, and (2) that the $48,000 constituted liquidated damages and not a penalty.

## II. "GOOD AND MERCHANTABLE FEE SIMPLE TITLE"

The district court determined that U. S. Steel's mineral reservation coupled with the damage release destroyed the merchantability of the land in question and that this encumbrance prevented Shel-Al from conveying "good and merchantable fee simple title," as required by the purchase commitment. Shel-Al argues that in determining whether title is marketable the controlling question is whether or not the market value of the estate is affected. Appellant's contention is that the reservation of mineral rights will not affect the use and enjoyment of the real estate because there is no right to use the surface of the land. Because U. S. Steel abandoned all mineral operations in Jefferson County in 1962, because any minerals of value under the property are of the depth greater than 450 feet, and because all the surrounding area has been developed commercially, appellant asserts that the mineral reservations here would not have the slightest effect on the use and enjoyment of the land and thus on its merchantability.

■ Both parties agreed that Alabama law applied. Although there was no authority directly on point, several Alabama decisions clearly indicate that such an encumbrance is sufficient to destroy merchantability. *See* Brooks v. Shepard, 157 F.Supp. 379 (S.D.Ala.

1957); Blaxton v. J. L. Tood Auction Co., 281 Ala. 621, 622, 206 So.2d 867, 878 (1968); Johnson v. Malone, 252 Ala. 609, 42 So.2d 505, 509 (1949). Also decisions in other jurisdictions support the conclusion that title is not merchantable when mineral rights to property are reserved to a third party. *See* Winter v. Mackie, 376 Mich. 11, 135 N. W.2d 364 (1965); Snaman v. Barardino, 136 Pa.Super. 177, 7 A.2d 140 (1939). Finally, the encumbrance here was more than merely the reservation to extract minerals, but also included a plenary release of all claims for injury which might be suffered by the landowner as a result of either past or future mining operations. A similar release has been held by the Alabama Supreme Court to constitute an encumbrance of property and to be enforceable. Republic Steel Corp. v. Payne, 272 Ala. 483, 132 So.2d 581 (1961). We concur with the district court that the mineral reservation coupled with the damage release clause was a sufficient impediment to title to prevent there being a "good and merchantable fee simple title."

■ We find no merit in the argument that American National had previously dealt in property containing mineral reservations. This contract stands on its own terms. What was tendered was simply not a "good and merchantable fee simple title" to the land. Moreover, American National responds that its prior mortgage venture in Jefferson County did not involve a six-story structure with an existing mine shaft underneath which still contains ore and a refusal to release mineral reservations as U. S. Steel initially did. Also, American National points out that when Shel-Al approached Liberty National, Birmingham's largest life insurance company which was totally familiar with the local situation, that they specifically had the same concern over the mineral reservation and damage release provisions in the deed.[6]

6. Specifically, the record showed that Liberty National's Executive Vice President responded to Shel-Al's attorney as follows:

"I told Ed we would have the same reservations [as American National] about mineral rights; that we could just not make

■ We also agree with the trial court that American National was not dilatory with respect to notifying Shel-Al of its position regarding the defective title, that it demanded a cure which was not furnished by Shel-Al and that it could not be charged with an anticipatory breach of the contract.

## III. STAND-BY DEPOSIT FEE AS LIQUIDATED DAMAGES

The district court held that Shel-Al did not sustain its burden of establishing that the $48,000 stand-by deposit fee was a penalty as distinguished from liquidated damages. Shel-Al's contentions on appeal are (1) that the trial court erroneously placed the burden of proof on this issue on Shel-Al; and (2) that these clauses providing for retention of the deposit were penal in character as a matter of Alabama law. There is no Alabama decision in point on the burden of proof issue; however, the weight of authority places the burden of establishing the contract provision to be a penalty on the party urging it. Harbor Island SPA, Inc. v. Norwegian America Line A/S, 314 F.Supp. 471, 474 (S.D.N.Y.1970); Manufacturers Cas. Ins. Co. v. Sho-Me Power Corp., 157 F.Supp. 681 (W.D.Mo.1957). But cf. Waggoner v. Johnston, 408 P.2d 761 (Okla.1965); Patterson v. Anderson Motor Co., 45 Tenn.App. 35, 319 S.W.2d 492 (1965).[7]

■ Even if this burden of proof had been placed on American National, there was adequate evidence to sustain the finding that the $48,000 was liquidated damages, since American National's probable damages were not readily capable of accurate ascertainment and were not out of proportion to the stipulated $48,000. The district court pointed out that two elements of damages could be sustained by American National as a result of the commitment's abortion. First, for the entire period of the commitment American National had to manage its affairs so that it would have available at the correct time the $1,600,000, which would encompass possible loss of interest rate on that amount for an undefinable period. Second, another cost to American National if the commitment was not consummated was the administrative expense involved in preparing for the proposed closing. The record showed that American National hired attorneys in Galveston and Birmingham and expended considerable time of one of its agents in letters, telephone calls and inquiries. Regardless of who had the burden of proof, there was substantial evidence to support the court's judgment for American National.

According to Shel-Al, in determining the difference between a penalty and a liquidated damages provision, one line of authority examines only whether the actual amount of damages is disproportionate to the amount stipulated. Another line, asserts Shel-Al, is concerned solely with whether or not there is an agreement of the parties that damages would be difficult of ascertainment. The principal case relied on by Shel-Al, Stratton v. Fike, 166 Ala. 203, 51 So. 874 (1909), is alleged to be in this second group which considers evidence of the actual amount of damages irrelevant and inadmissible. Shel-Al asserts that

a loan of a large amount on a property where these rights are outstanding. I told him that were there no possibility of mining, then it appeared to me the owner of the mineral rights should be willing to sell them for a nominal sum. If they were not willing to sell them, then it created some concern that they might be hopeful of mining at some future date."

7. Shel-Al cites these decisions from Oklahoma and Tennessee as authority for placing the burden of proof on American National. Other state decisions, agreeing with the federal decisions cited, have cast the burden of proof on the party seeking to sustain the provision as a penalty. See Canadian Mining Co. v. Creeckmore, 226 Ark. 980, 295 S.W.2d 357, 360 (1956); Electrical Products Corp. of Colorado v. Mosko, 88 Colo. 447, 297 P. 991 (1931); Howard v. Bar Bell Land & Cattle Co., 81 Idaho 189, 340 P.2d 103, 107 (1959); Silver Dollar Club v. Cosgriff Neon Co., 80 Nev. 108, 389 P.2d 923, 925 (1964); Perma Stone Bi County Corp. v. Ackerman, 15 Misc.2d 640, 182 N.Y.S.2d 655, 657 (1959).

*Stratton* focuses on whether the parties agreed as a matter of fact that the damages were uncertain and not on whether the damages are uncertain in fact from the nature of the contract. The Supreme Court of Alabama in *Stratton, supra* at 876–877, stated:

"The intention of the parties to the contract, however, must control in all cases, if that can be ascertained. 'The object and end to be attained in all construction of contracts is to ascertain the intention of the parties, and this is no exception to the rule. . ·. .' The first general principle in the construction of all contracts is that they shall be so expounded as to carry into effect the intention of the parties. To this end, the court should, if necessary, look to the subject matter of the contract, the situation of the parties, the motives that led to it, and the objects intended to be attained by it.

. . . . . .

"If, from the nature of the contract, the damages for the breach cannot be calculated with any degree of certainty, a stipulated sum will usually be held to be liquidated damages—that is, it will be considered that the parties agreed in advance upon the amount, and it will be so treated—but, if it is doubtful from the whole contract as to which was intended, the courts, being inclined to do equal justice to the parties if possible, will resolve the doubt in favor of the penalty construction. . . . Where the damages sustained by a breach of a single stipulation in a contract are uncertain, and there is no fixed or certain standard or data by which they can be ascertained, and the parties in the contract have fixed that amount, it is reasonable to conclude that they named and fixed that amount because the amount would be uncertain if there was a breach; and it will be so treated. It will in such case be considered by the court as the measure of compensation for the breach, if it is not out of all proportion to the probable and presumable loss. Stipulations for a certain amount of damages in ordinary building contracts for failure to complete within a given time, if not clearly disproportionate to the probable loss, will be construed to be liquidated damages and enforceable as such."

Beginning with the central inquiry of determining the intention of the parties, *Stratton* examines not whether the parties themselves *agreed* at the time of making the contract that the damages were uncertain, but whether as a matter of fact from the "nature of the contract" damages were uncertain. *Stratton* implies that if a court. finds damages to have been uncertain and the amounts stipulated as damages in case of breach are not out of proportion to probable damages, then it may be concluded that the parties stipulated damages because of these combined circumstances. The parties here were competent to contract. To construe the liquidated damages provision initially as a penalty, in the language of *Stratton, supra* at 877, "would give the stipulation no effect whatever, and would be making a contract for the parties and not construing the one they made."

The thrust of Shel-Al's second contention is that the stand-by deposits are void and unenforceable as a matter of law. The principal argument is that since there were several covenants to be performed in the commitment, some of minimal or trivial importance, a stipulated sum made payable for failure to perform any condition, including the relatively unimportant ones, may be held a penalty. Shel-Al's thesis is that a contract which calls for the forfeiture of a fixed sum for the failure to fulfill various conditions of differing importance, is invalid because the damage suffered for the failure to fulfill one condition cannot possibly be the same as for the failure to perform another. Therefore, the parties to such a contract would not have agreed that the fixed amount was a reasonable estimate of the damage to be suffered and hence the fixed amount is

penal in character. Shel-Al's authority for this proposition is again language in *Stratton, supra* at 876, to wit:

"Where the agreement or covenant is for the performance of several things, and the stipulation is for the payment of a sum in gross in the event of a failure to perform, in whole or in part, the sum stated will be considered as a penalty. . . . ",

in addition to the admonishment in Keeble v. Keeble, 85 Ala. 552, 5 So. 149, 150 (1888):

"When the contract provides for the performance of several acts or different degrees of importance, and the damages resulting from the violation of some, although not all, of the provisions are of easy ascertainment, and one large gross sum is stipulated to be paid for the breach of any, it will be construed a penalty and not as liquidated damages."

Finally, Shel-Al asserts that under Alabama law a lump sum which is forfeited is case of breach whose purpose is to secure the performance of a party is construed as an unenforceable penalty. Forsyth v. Central Foundry Co., 240 Ala. 277, 198 So. 706 (1940). Here, argues Shel-Al, exact compliance and exact performance of each of the conditions in the commitment were necessary or the $48,000 would be lost. Therefore, this fee was to secure performance and was unenforceable.

■ American National counters that these arguments concerning lump sum forfeiture for failure to fulfill one of many conditions are not the applicable theories in this case. Here, unlike the contract to build a house or to perform a job, the financing either takes place in which case there is a refund of the stand-by deposit, or it does not, in which case the deposit is retained. All of the various covenants of Shel-Al are

parts of a single complex act, the closing of the purchase and loan, and the precise damage where the breach of covenants results in a failure to close, is incapable of being ascertained in advance and is therefore a proper situation for liquidated damages. There is a series of covenants which call for a single act which are all part of one complex act, all with one primary purpose, so that in essence the contract calls for one stipulation— the closing of the loan. The several conditions to be performed by the parties are but steps leading up to that primary purpose, and it is clear that the stipulated sum was intended to fix the amount of damages to be paid in case a single act—the closing—was not carried out.[8]

Moreover, prior Alabama cases were not concerned with a stand-by deposit situation and Shel-Al does not cite any decision in Alabama or another jurisdiction which has held as a matter of law that a stand-by deposit in these circumstances is void as a penalty. Rather, the courts have unanimously enforced stand-by clauses as a thoroughly lawful manner of doing business in the mortgage finance world. American National cites seven decisions, in which various types of stand-by deposit provisions have been attacked in one way or another, and in each the courts have sustained the validity of the provisions. Regional Enterprises, Inc. v. Teachers Ins. & Annuity Ass'n, 352 F.2d 768 (9th Cir.1965); Chambers & Co. v. Equitable Life Assurance Soc'y, 224 F.2d 338 (5th Cir. 1955); White Lakes Shopping Center v. Jefferson Standard Life Ins. Co., 208 Kan. 121, 490 P.2d 609 (1970); Goldman v. Connecticut Gen. Life Ins. Co., 251 Md. 575, 248 A.2d 154 (1968); Paley v. Barton Savings & Loan Ass'n, 82 N.J.Super. 75, 196 A.2d 682 (Super. Ct. N.J.1964); Boston Road Shopping Center, Inc. v. Teachers Ins. & Annuity Ass'n, 13 A.D.2d 106, 213 N.Y.S.2d 522

---

8. The rule sustaining the validity of a liquidated damage provision in a contract containing several covenants all directed toward the consummation of one complex act has been sustained by courts outside of Alabama, see

Suburban Gas Co. v. Mollica, 21 N.J.Misc. 118, 32 A.2d 462, 465 (1943); Kansas City v. Industrial Gas Co., 138 Kan. 755, 28 P.2d 968, 972 (1934); Madler v. Silverstone, 55 Wash. 159, 104 P. 165, 167 (1909).

(1961), aff'd, 11 N.Y.2d 831, 227 N.Y.S. 2d 444, 182 N.E.2d 116 (1962); Continental Assurance Co. v. Van Cleve Bldg. & Constr. Co., 260 S.W.2d 319 (Mo.App. 1953).[9] Although the Alabama courts may in the future conclude that stand-by deposits are inherently unconscionable and illegal, we cannot ascertain any basis in the current Alabama law, nor in other jurisdictions, to support a ruling here that stand-by deposits are per se void.

The judgment is affirmed.

9. It is noteworthy that in Pembroke v. Caudill, 160 Fla. 948, 37 So.2d 538 (1948), a suit by a vendor to recover cash deposit as liquidated damages from defaulting purchasers, where the Florida Supreme Court held that the deposit receipt contract clearly provided for a penalty as a matter of law, was overruled in H. D. Hutchison v. C. E. Thompkins, 259 So.2d 129, 132 (Fla.1972), where the Florida Supreme Court determined Pembroke "must have, when followed in letter and spirit, . . . a chilling effect on contract negotiations where the parties wish to include a provision for liquidated damages."