**FRANK'S NURSERY SALES, INC., a Michigan Corporation, Plaintiff and Counter-Defendant,**

v.

**AMERICAN NATIONAL INSURANCE COMPANY, a Foreign Corporation, and Citizens Mortgage Corporation, a Michigan Corporation, Defendants and Counter-Plaintiffs.**

Civ. A. No. 38093.

United States District Court,
E. D. Michigan, S. D.

Oct. 7, 1974.

Sheldon G. Larky, Southfield, Mich., for plaintiff and counter-defendant.

Avern Cohn, Detroit, Mich., for defendants and counter-plaintiffs.

## MEMORANDUM OPINION

**PHILIP PRATT,** District Judge.

Frank's Nursery Sales, Inc., a Michigan corporation (Frank's), instituted its suit against American National Insurance Company, a foreign corporation (American), seeking to recover a standby fee paid by Frank's as a result of the failure of the parties to complete a mortgage transaction. Jurisdiction is founded on diversity under 28 U.S.C. § 1332.

The matter was tried to the Court without a jury on the basis of several stipulations, including the submission of testimonial evidence by videotape. Defendant Citizens Mortgage Corporation was dismissed by stipulation of the parties. The Court makes the following findings of fact.

Frank's is engaged in the retail garden and nursery business and owns and operates a number of stores in Michigan, Indiana and Ohio. In the 1970–1971 period, it decided to expand in the Columbus, Ohio, area and began negotiating for the purchase of a parcel of land in the northerly section of that city from the Davis Investment Company (Davis). Davis owned approximately 11 acres of land being developed as a neighborhood shopping center. Frank's negotiated the purchase of approximately 2.6 acres of that land under a short term land contract.[1]

As a part of those purchase negotiations, Frank's and Davis also agreed to certain use restrictions, and the agreement regarding restrictions were incorporated in separate documents (Ex. F & G) executed contemporaneously with the warranty deed. The restriction document executed by Frank's in accordance, presumably, with prior agreements, contained the following pertinent provision:

"1. Grantor hereby convenants and agrees that no part of the premises hereinbefore described owned by Grantor shall be developed for, used as, or leased for any business, the principal portion of which business would be in competition with any business or businesses operated by Grantee, its successors or assigns, its lessees or tenants or their assigns, concessionnaires or sublessees on the property owned by Grantee west of and east of the property described herein, except:

(1) should the Grantor discontinue the operation of its business as a garden center and nursery sales, or

(2) reduce Grantor's operation of its business as a garden center and nursery sales to an area no less than the easterly 220 ft. of Grantor's building line and north thereof to the service drive; and in those events only, the Grantor may lease, sublease, or assign any leasehold interest in the Grantor's premises upon thirty (30) days' written notice to Grantee prior to execution of any lease, but in no event to any tenant or assignee whose principle (sic) business would be in competition with any business or businesses on contiguous premises owned by the Grantee and operated by the Grantee, its successors or assigns, its lessees or tenants or their assigns, concessionnaires or sublessees on the premises hereinbefore described of Grantor at the time of the Grantor's subletting or assignment."

In the Spring of 1971, Frank's approached Citizens Mortgage Corporation, a mortgage broker, for assistance in financing the purchase of the land and construction of a store on the site. Citizens corresponded with the defendant, American National Insurance Company, and forwarded to the latter a mortgage loan application for a mortgage of $475.-

---

1. A warranty deed pursuant thereto was executed on September 17, 1974 (Ex. E).

000. That application contained a provision for a "standby fee" of 3%.

On July 27, 1971, the defendant approved a $450,000 mortgage and issued its commitment therefor (Ex. A). Among other conditions, the following were set forth:

"1. That applicant have good and merchantable record title to the property described in the application and inspected by appraiser for this Company.

20. At the time this commitment is accepted, the applicant shall make a deposit of $13,500 as a standby fee. In the event all the conditions and requirements of this commitment are not satisfied and the loan is not closed prior to the expiration of this commitment, the standby fee shall be retained as liquidated damages; otherwise, the fee shall be refunded upon closing of this loan.

This commitment shall be binding on us until August 16, 1971; but if a written acceptance, together with the required standby fee, is delivered to us prior to such date, then this commitment shall be thereafter binding until December 1, 1971, or until this loan is closed, whichever occurs first. If this loan is not closed on or before November 30, 1971, this commitment shall terminate and be of no further force or effect."

The offer was accepted by Frank's on August 3, 1971.[2]

Thereafter, Frank's began to obtain the necessary documentation and information to fulfill the requirements of the commitment. One of the submissions was an appraiser's report dated August 24, 1971 (Ex. M) which included the following:

"Overall, the subject property is highly adaptable to many uses thus being available to various commercial users." (Ex. M, page 30).

On September 16, 1971, local counsel in Columbus for defendant was presented with drafts of the warranty deed and the two deed restrictions. For the first time, on September 20, 1971, defendant's home office was apprised of the exclusivity provisions regarding the use to which the proposed store could be put. On September 22, 1971, home office counsel wrote to Frank's Michigan counsel, to advise that a requested closing date of September 28, 1971, was not a realistic one (Ex. 21). In that same letter, defendant advised Frank's that:

"Also, Frank's Nursery Sales, Inc., should not be required to limit the uses of its property so as to avoid competing with any types of business which might, nor or in the future, be conducted by David Investment Co., its successors, assigns, concessionaires and lessees. Rather, any restriction as to use of subject premises should be limited only to specific uses such as a variety store, drug store or super market. However, in no event, should these prohibited uses include fast food operations or service stations."

Thereafter, although most, if not all of the commitment requirements were met, the use restrictions continued to be difficult, and eventually, insurmountable obstacles. It appears that all parties attempted to resolve the problem but interests were polarized and the attempts were futile. The sellers were apparently obligated to other purchasers and tenants and the defendant considered that its security was appreciably weakened in the event of a foreclosure since its market would be limited greatly by the permitted uses at the time of foreclosure. As the commitment expiration date approached it became obvious that the mortgage transaction could not be completed.[3]

---

2. The commitment was amended (Ex. B) but the amendments are not critical here.

3. Several methods were used to resolve the restriction problem including a reduction of

$100,000 in the amount of the mortgage. There was also discussion of extending the commitment expiration date. However, neither of these alternatives reached fruition

On December 6, 1971, defendant revoked its commitment and retained the $13,500 standby fee as liquidated damages.

With regard to the effect of the use restrictions on the attitude and willingness of a mortgage investor to loan money, it is interesting to note that defendant was not the only lender to consider the use restriction as incompatible with the risk involved. Joel Rosenthal, Frank's real estate official, testified that Citizens Mortgage had advised him that the use restrictions hampered at least one other putative lender. In addition, on November 12, 1971, another broker contacted by Frank's advised Mr. Rosenthal by letter (Ex. 33) that:

"Because of the extenuating circumstances concerning deed restrictions, we cannot find a home for the above captioned loan. Therefore, we are returning your good faith deposit in the amount of $5,000."[4]

Despite these rather strong indications of the effect of use restrictions of the type here involved on commercial mortgage financing, defendant's real estate officer, Joel Rosenthal, insisted that use restrictions do not have a particularly inhibiting influence in the market. In effect, his testimony was that while use restrictions may theoretically diminish the value of land and reduce the full panoply of an owner's rights with regard to land, as a practical matter, his experience leads him to the conclusion that rarely, if ever, does the theoretical occur. The Court finds it difficult to accept the logic and import of that testimony, especially in view of the difficulty of the mortgage brokers to obtain financing from other lenders because of those very use restrictions. The testimony of Drew C. Boggs, defendant's Regional Manager, Mortgage Loan Department, is much more appealing and convincing. This testimony indicates, first of all, that while exclusivity of use restrictions are not uncommon, usually the restriction is to enumerated and limited types of commercial enterprises, as opposed to the rather general and actually unascertainable type in this case (Ex. 24). It is patently apparent that the more restricted the use is, the more apprehensive the lender becomes, and rightly so, for in the event of a foreclosure his market is limited to permitted uses and his search for a buyer that much more burdensome.

With regard to the standby fee of $13,500, it appears that one of its purposes is to deter a borrower from attempting to obtain more favorable financing after a lender has committed its funds. The issuance of a commitment involves research, investigation, analysis and processing through a lender's administrative and policy making organs. It entails time and expense. It also requires the allocation of committed funds and precludes the use of such funds despite more lucrative opportunities that may present themselves after the issuance of the commitment.[5]

In addition to the foregoing, defendant offered evidence regarding its actual expenses and potential loss of profits to combat the argument that the standby fee was, in reality, an unenforceable penalty clause. That evidence established that the loss to the defendant as a result of the failure to complete the mortgage transaction was $14,758.07 (Ex. 35); that wage costs (Ex. 36) related to proc-

---

and no claim is made by Frank's that either creates a cause of action.

4. The date of that letter, November 12, 1971, is intriguing. The reasonable inference is that even while negotiating with defendant in an attempt to resolve the use restriction and other problems, defendant was seeking other financing. Whether this was an attempt to obtain lower interest rates, an acceptance of the use restriction impasse, or

for some other purpose was not explained. At any rate, at least at that time, Frank's knew that neither defendant nor Aetna-Life Insurance Co. would approve a loan which was subject to the use restrictions.

5. As a matter of fact, interest rates were higher in December, 1971, 9¼% as opposed to 8¾%, on the date of the commitment. Eventually Frank's obtained a mortgage at an 8¼% interest rate in 1972 (Ex. N).

essing the transaction were $1,065.74. (this figure does not take into account fixed expenses, such as space, equipment, stationery and supplies) and attorney fees amounted to approximately $3,000 (these fees do not relate to litigation expenses).

### Issues

I. Where a loan commitment requires a mortgagor to have "good and merchantable record title" to the real property to be given as security, does a title which is subject to use restrictions satisfy the merchantable title requirement.

II. Is the $13,500 standby fee (3% of the mortgage loan principal) which is retained in the event of failure to complete the transaction, an unenforceable penalty clause or a proper liquidated damage clause.

### Conclusions of Law

#### I.

As to the first issue, it is clear from the mortgage commitment executed between the parties that the plaintiff was required, as a condition precedent to the defendant's obligation to close the loan, to possess "good and merchantable record title." Merchantable title, under Ohio law is synonymous with marketable title. Horton v. Matheny, 72 Ohio App. 187, 51 N.E.2d 41 (1943). Therefore, the instant analysis must concern itself with the applicability of marketable title principles to the case at bar, in accordance with Ohio law which this Court must apply.[6]

In Rife v. Lybanger, 49 Ohio St. 422, 429, 31 N.E. 768, 770 (1892) the Ohio Court of Appeals held as to marketable title, "If the title is such that it ought to satisfy a man of ordinary prudence, it is sufficient." Later, in McCarty v. Lingham, 111 Ohio St. 551, 557–558, 146 N.E. 64, 66 (1924), the Court observed that:

"As to what constitutes a marketable title no hard and fast rule can be declared to govern every state of facts which might be presented in the numerous controversies which are likely to arise . . . and each case is therefore *sui generis*. Some attorneys are more technical than others in advising their clients upon the defects of greater or less importance to be found in an abstract of title, and some purchasers are more timid than others, and the court can therefore do nothing more than establish a very general rule. As a result of the numerous expressions of the courts on this subject, it may be conservatively stated that a marketable title is one which imports such ownership as insures to the owner the peaceable enjoyment and control of the land as against all others . . . It must in any event embrace the entire estate or interest sold, and that free from the lien of all burdens, charges, or incumbrances which present doubtful questions of law or fact."

This case by case analysis was applied in Frank v. Murphy, 64 Ohio App. 501, 29 N.E.2d 41 (1940), the sole appellate opinion which touches the issues herein raised. In *Frank* the vendor was possessed of property which was subject to various use restrictions as well as a driveway easement. The Court held that the vendor could not obtain specific performance of the sales contract because he could not grant a "clear title" as had been agreed upon in the executed contract. In passing, the court observed that these encumbrances upon the prop-

---

6. If the laws of two or more states are involved in a problem, the conflicts of laws rules of the forum state control. Thus, this Court is bound to apply the Michigan Conflicts of Laws rules. Carson v. U-Haul, 435 F.2d 916 (6th Cir. 1970). Michigan follows the rule that when the making and performance of a contract occur in different states, the substantive law of the place of performance governs the interpretation of that contract. George Realty Co. v. Gulf Refining Co., 275 Mich. 442, 266 N.W. 411 (1936). In this case it is conceded that the contract in question was to be performed in Ohio. Hence, this Court is bound to look to Ohio law.

erty raised serious doubts as to whether the vendor had even marketable title.[7]

In a lengthy analysis of the nation's law regarding marketable title, the commentators have concluded:

> "The rule that the vendee in an executory contract for the sale of land is entitled to a marketable title, which means a title in fee simple, free from encumbrances, entitles a vendee to a title free from any restrictions which affect the full enjoyment of the property; hence, restrictions as to the use to which the premises may be put, or as to location, character or kind of buildings, depth of foundations etc., which may be erected in or upon the land, render the title unmarketable." 57 A.L.R. 1253, 1414–18 (footnotes omitted).

The aforementioned annotation is not wholly dispositive of the case at bar because it equated perfect title, clear title, merchantable title and marketable title. Ohio does not lump these concepts together, but chooses to recognize certain distinctions between and among them.

■ There is little doubt that use restrictions encumber to some degree, the property to be transferred. If the issue herein pertained to clear title, then the existence of such use restrictions would obviously negate the existence of adequate title. However, we are herein faced with marketable title, and as such, the key question under Ohio law is whether or not a man of ordinary prudence would find this title sufficient. Rife v. Lybarger, *supra.*

■ Defendant, American National Insurance Company, balked at the title because it was encumbered by the use restrictions. American was not alone in its hesitancy as was amply illustrated by the testimony of Frank's real estate official, Joel Rosenthal. This Court must therefore conclude that American acted reasonably under the circumstances and that the substantial use restrictions effectively prevented Frank's title from being viewed as a marketable one. Consequently Frank's breached its contract with American in that it failed to stand ready to transfer "good and merchantable title" as was required under the executed mortgage commitment.

■■ The plaintiff argues that even if his title was not a marketable one, he is not in breach of contract because he was excused due to the doctrine of impossibility of performance. The Court finds this argument without merit. Although impossibility, as a general rule, will excuse performance, it will not serve to discharge a party who has assumed the risk that a given event will be rendered impossible. In the instant case, Frank's covenanted, as a condition precedent to American's duty to perform, to be possessed of "good and merchantable title." Clearly, Frank's assumed the risk that the title it possessed was not marketable when it accepted American's mortgage commitment. To hold otherwise would be to implicitly excuse breaches of contract merely because the defaulting party is unable to remedy the breach. To that extreme, this Court is unwilling to go.

## II.

Frank's acceptance of American National's Mortgage commitment was conditioned upon the previously quoted standby fee:

> "At the time this commitment is accepted, the applicant shall make a deposit of $13,500 as a standby fee. In the event all the conditions and requirements of this commitment are not satisfied by the applicant and the loan is not closed prior to the expiration of this commitment, the standby fee shall be retained as liquidated damages; otherwise, the fee shall be refunded upon closing of this loan."

---

7. Clear title requires the property to be free from any *reasonable* questions of law or fact whereas marketable title merely requires it to be free from *doubtful* questions of law or fact. Frank v. Murphy, supra.

■ So long as this clause is not a penalty, Ohio law recognizes its validity as a liquidated damages clause, Doan v. Rogan, 79 Ohio St. 372, 87 N.E. 263 (1909). The standard to be employed by the Ohio courts in assessing the validity of such clauses was articulated by the Supreme Court of Ohio in the case of Jones v. Stevens, 112 Ohio St. 43, 49, 146 N.E. 894, 895 (1925) wherein it held that:

> "[l]iquidated damages (as opposed to penalties) exist in a contract when (1) the damages would be uncertain as to amount and difficult of proof; (2) when the contract as a whole is not so manifestly unreasonable and disproportionate as to justify the conclusion that it does not express the true intentions of the parties; and (3) when the contract is consistent with the conclusion that it was the intention of the parties that the damages in the amount stated should follow the breach."

■ When the mortgage commitment was entered into by the parties, the prospective damages to be suffered by the defendant in the event of breach were not readily ascertainable, particularly in this area which is subject to considerable price fluctuations. The fact that the defendant introduced evidence of the actual damages it suffered does not prevent this Court from holding that the damages were uncertain in amount and difficult of proof at the time the commitment was entered into. This Court is of the opinion that at the time the commitment was entered into the damages were both uncertain in amount and difficult to ascertain.

The defendant introduced evidence that it had suffered damages in the amount of $18,823.81 whereas the standby fee retained by the defendant amounted to $13,500. Moreover, the fee amounted to only three per cent of the total mortgage commitment.[8] Accordingly, the amount retained does not shock the conscience of this Court such that the agreement appears to be manifestly unreasonable or so disproportionate to the sums involved as to raise serious doubts as to the parties' true intentions.

■ It appears manifestly clear from the face of the documents that the parties intended, that in the event of a breach by Franks, the stated damages would be incurred. Although this Court finds that *a* purpose of the standby fee was to encourage the consummation of the mortgage, this purpose does not transform the clause into a penalty.[9] Indeed, it would fly in the face of this Court's understanding of human psychology to say that the potential imposition of damages is not a factor in deterring nearly all breaches of contract. Thus the fact that liquidated damages encourages the completion of a contract does not render them unenforceable as a penalty. To so hold would be to impliedly state that nearly all liquidated damages clauses are unenforceable penalties, a patently ludicrous result.

From the foregoing it is readily apparent that the instant clause meets all three requirements imposed by the Ohio courts in order to be enforceable as a liquidated damages provision. Moreover, several courts have been faced with the identical issue herein under consideration, and they have unanimously upheld the standby fee provisions as valid liquidated damages clauses—not penalties. Shel-Al Corp. v. American

8. In Re Four Seasons Nursing Centers of America, Inc., 483 F.2d 599 (10th Cir. 1973) held that a similar 3% commitment fee was not excessive under circumstances somewhat similar to the instant case.

9. Perhaps if certain other factors were present in addition to this avowed purpose, the clause would appear more like a penalty, but such is not the instant case. For example, if the fee amounted to 20% of the total loan commitment, it would appear much more likely that the sum was unreasonable and that the sole purpose behind its inclusion was to bludgeon the borrower into entering into the loan transactions out of fear of forfeiting a sizeable deposit. But Cf. Village of Pomeroy v. Ringwald, 13 Ohio App. 367 (1920).

National Ins. Co., 492 F.2d 87 (5th Cir. 1974);[10] White Lakes Shopping Center v. Jefferson Std. Life Ins. Co., 208 Kan. 121, 490 P.2d 609 (1971); Goldman v. Connecticut General Life Ins. Co., 251 Md. 575, 248 A.2d 154 (1968); Boston Road Shopping Center v. Teachers Ins. & Annuity Ass'n., 13 A.D.2d 106, 213 N.Y.2d 522 (1961) aff'd 11 N.Y.2d 831 (1962). This Court is of the opinion that the instant clause, like those in the aforecited cases, represents a valid, enforceable liquidated damages provision.

■ In addition, this Court finds additional, independent grounds upon which to enforce the clause as written. Several courts have sustained these clauses by looking to the business practicalities involved. Some of these courts have rested their decision upon a characterization of the standby fee as a charge for keeping loan monies available to the borrowers, as was done in Chambers & Co. v. Equitable Life Assurance Soc., 224 F.2d 338 (5th Cir. 1955). See also In Re Four Seasons Nursing Centers of America, Inc., *supra.* Others have sustained such clauses on the basis that the parties dealt with each other at arms length and that the clause was merely an attempt to insure the good faith performance of the borrower. Regional Enterprises v. Teachers Ins. & Annuity Ass'n., 352 F.2d 768 (9th Cir. 1965). See also Paley v. Burton Savings & Loan Ass'n., 82 N.J.Super. 75, 196 A.2d 682 (1964); Continental Assur. Co. v. Van Cleve Bldg. & Constr. Co., 260 S. W.2d 319 (Mo.App., 1953).[11] This Court is of the opinion that yet another persuasive ground for this decision can be found in an analysis of the practical business realities involved in these fees. Although not an option, per se, it appears that the instant clause is closely analogous to it and therefore may be enforced as a form of quasi option. See Goldman v. Connecticut General Life Ins. Co., *supra.*

■ The trend of authority is clear that the standby fee arrangement is valid and enforceable. Several courts have done so by viewing it as an enforceable liquidated damages clause. Other courts have looked more pragmatically at the business realities involved and given their judicial approval to these clauses on various theories. The plaintiff has cited no authority from any jurisdiction which has rebuffed the validity of these clauses and this Court's research has disclosed none. Accordingly, this Court finds the instant clause to be enforceable both as a liquidated damages clause and as a permissible tool of modern business and finance in the absence of any cited Ohio authority to the contrary.

Judgment may enter in favor of the defendant.

It is so ordered.

---

10. Although decided under Alabama law, this case is strikingly similar to the instant case. It involves the same defendant insurance company and the issues raised therein were whether the borrower was possessed of sufficient title to meet with the lender's specification and whether the standby fee was a valid liquidated damages clause.

11. Even if the *sole* purpose of the instant clause was to deter the borrower from obtaining more favorable financing, the clause could be sustained. See discussion supra, note 9.