[Civ. No. 32332. First Dist., Div. One. Jan. 23, 1976.]

KARL K. LOWE, Plaintiff and Appellant, v.
MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,
Defendant and Respondent.

CONTRACT DESIGN ASSOCIATES, LTD.,
Plaintiff and Appellant, v.
MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY,
Defendant and Respondent.

## COUNSEL

Mitchell & Smith, David L. Smith, Berk, Bise, Alpern & Rosen and Jack I. Rosen for Plaintiffs and Appellants.

George L. Cooke for Defendant and Respondent.

## OPINION

**SIMS, J.**—Appellants Karl K. Lowe and Contract Design Associates, Ltd., as assignees of an applicant for a real estate loan from respondent insurance company, have each appealed from separate judgments, entered after a consolidated trial by the court, which denied their claim that their assignor was entitled to the return of $94,000 deposited with the company in connection with its commitment to lend the assignor $4,700,000 upon compliance with the conditions stated in the agreement between the company and the assignor.

They contend that the trial court erred in finding that the commitment agreement constituted an option and in finding that the amount deposited and retained by the company did not constitute liquidated damages and, as such, a penalty proscribed by law. They also assert that the court erred in denying their motion for a new trial because there were irregularities in the proceedings which prevented them from having a fair trial, and because there was insufficient evidence to justify the decision. An examination of the record in the light of applicable principles of law reflects that there is no merit to these contentions. The judgments must be affirmed. It is therefore unnecessary to examine the respondent's counter-contention that the trial court erred in preventing the company from examining into the validity and effectiveness of the assignment relied upon by claimant Lowe.

The trial court found that on or about August 2, 1962, plaintiffs' assignor made a written application to the life insurance company for a real estate loan in the amount of $4,850,000. The application contained the following provision: "Stand-by deposit of $48,500 (to be increased to $97,000 upon approval of this application) accompanies (or will be paid to you immediately upon advice of your approval of) this application. Said deposit is to be returned when the loan is completed; but if the loan is not closed within the time to be agreed upon, said deposit shall be

retained by you as liquidated damages (beyond the direct costs which applicant agrees, at paragraph 6 above, to pay)." $48,500 was paid with the application.

Under date of October 31, 1962, the company wrote the applicant that the application had been approved on a modified basis. This letter, which was approved by the applicant on November 12, 1962, reduced the amount of the loan to $4,700,000, provided that the commitment would be firm until March 31, 1964, and that funds would be disbursed between January 1 and March 31, 1964, on a date selected by the lender, upon compliance with requirements set forth in the commitment letter. These requirements consisted of the completion of a projected 250-room hotel, an office building and underground garage all to approved specifications, of the delivery as collateral security of a chattel mortgage on the chattels used in the hotel and assignments of leases with designated tenants for the hotel, garage and a portion of the office building, and with other tenants, to be approved, up to minimum prescribed standards of space and gross rents. In addition the prospective borrower was to deposit an additional $45,500 to increase the total stand-by deposit to $94,000. That sum was paid by the assignor.

The court expressly found that under the terms of the commitment letter defendant was contractually obligated to lend $4,700,000 upon the applicant-assignor's compliance with the conditions stated in the letter of commitment dated October 31, 1962. This finding is not questioned by the assignees. In fact the record reflects that after assignments to plaintiff Lowe dated December 31, 1962, and January 2, 1963, and a demand by Lowe for payment in May 1963, the commitment was in fact extended for two years to March 31, 1966, but the project was never completed as contemplated.

The court further found that plaintiffs' assignor was not contractually bound or obligated to either meet the conditions stated in said commitment letter or to accept the loan which the company was committed to make; that the commitment letter, when accepted by plaintiffs' assignor, constituted an option by which the company was irrevocably committed to the assignor to lend the sum of $4,700,000 when and if it met and performed the conditions contained in that letter; that the sum of $94,000 paid by plaintiffs' assignor constituted the agreed consideration for said stand-by commitment; and that the sum of $94,000 paid by plaintiffs' assignor to the company did not constitute liquidated damages.

-A-

■ Plaintiffs attack the findings last referred to by attempting to establish that there was a bilateral contract, under which their assignor was bound not only to carry out all the conditions in the commitment letter, but also to borrow exclusively from the company which furnished him the letter. We have not been referred to any provision of the original application or the commitment letter under which the assignor expressly agreed to so perform.

■ "An option, when supported by consideration, . . . is a *right* acquired by contract to accept or reject a present offer within a limited time in the future. [Citation.]" (*County of San Diego* v. *Miller* (1975) 13 Cal.3d 684, 688 [119 Cal.Rptr. 491, 532 P.2d 139]. See also *Warner Bros. Pictures* v. *Brodel* (1948) 31 Cal.2d 766, 771-773 [192 P.2d 949, 3 A.L.R.2d 691]; *Welk* v. *Fainbarg* (1967) 255 Cal.App.2d 269, 276 [63 Cal.Rptr. 127]; *People* v. *Ocean Shore R.R. Co.* (1949) 90 Cal.App.2d 464, 469-475 [203 P.2d 579] [disapproved on another issue *County of San Diego* v. *Miller, supra,* 13 Cal.3d 684, 693]; *California Land Security Co.* v. *Ritchie* (1919) 40 Cal.App. 246, 255-256 [180 P. 625]; Rest., Contracts, §§ 24 and 47; and 1 Williston on Contracts (3d ed. 1957) §§ 61A, 61B and 61C, pp. 198-205.) "The outstanding factor is that the optionee is not bound until he acts on the option one way or another." (Williston, *op. cit.,* § 61B, pp. 199-200, and see authorities cited above passim.) "It is universally accepted that an option agreement is a contract distinct from the contract to which the option relates, since it does not bind the optionee to perform or enter into the contract upon the terms specified in the option." (*Warner Bros. Pictures* v. *Brodel, supra,* 31 Cal.2d 766, 771-772.)

■ The findings of the court are therefore sustained by the terms of the agreement itself. It nowhere bound the plaintiffs' assignor to perform the conditions precedent to the company's obligation to furnish the funds, or to solely rely on the company as the source of funds if the project was completed. In such event if a take-out loan on more favorable terms had been available from another lender, the developer was free to take such a loan, subject only to the loss of the stand-by deposit.

"In today's world, the commitment fee has become a fact of financial life. Most large projects are financed under agreements substantially similar to the one entered into between Greenspring and Connecticut.

[Citations.] The commitment fees are substantial, but are usually stated as a small percentage of the amount ultimately to be loaned. The courts, in holding that the fees were non-refundable in the event that the project is abandoned or that the borrower fails to take down the funds, have supported their conclusions by finding that the fee was intended to constitute liquidated damages, . . . as a fee for the commitment, . . . as a stand-by fee, . . . or as stand-by interest, . . ." (*Goldman* v. *Connecticut General Life Insurance Co.* (1968) 251 Md. 575, 579-580 [248 A.2d 154, 157-158]. See also Cal. Real Estate Syndicates and Investment Trusts (Cont. Ed. Bar 1962) §§ 2.19 and 2.20, pp. 30-31.)

In *Goldman* the court concluded, "Under the facts of this case, we view the payment made by Greenspring to Connecticut as the consideration paid for Connecticut's commitment letter. It is closely analogous to the payment made for an option, which has been defined as 'a contract to keep an offer open', 1 Williston, Contracts, § 61A at 198 (3d Ed. 1957); . . . This is precisely what Connecticut contracted to do." (251 Md. at p. 581 [128 A.2d at p. 158]. See also *Chambers & Company* v. *Equitable Life Assurance Soc.* (5th Cir. 1955) 224 F.2d 338, 343; *Paley* v. *Barton Savings & Loan Assn.* (1964) 82 N.J.Super. 75, 83-84 [196 A.2d 682, 686-687]; and *Franks Nursery Sales, Inc.* v. *American Nat. Ins. Co.* (E.D.Mich. 1974) 388 F.Supp. 76, 84.)

Although the courts of this state apparently have not reviewed the validity of a stand-by charge given in consideration for an option to secure a loan, similar charges have been upheld in other settings. In *Welk* v. *Fainbarg, supra,* the purchasers made a deposit of $20,000 on a purchase price of $480,000 for a parcel of land. They sought recovery of the deposit after failure to close the escrow within the stipulated time. On a review of all the evidence the court sustained the trial court's finding that the deposit was the unrefundable consideration for an option to purchase. It based that decision on the following conclusion, "In view of the patent inconsistency between the printed provisions of this instrument and its typed provisions, the latter of which are controlling, and the objective manifestations of the parties' intention at the time of the execution of the instrument properly in evidence, the conclusion is inescapable that the agreement could not be enforced against the plaintiffs." (255 Cal.App.2d at p. 276.)

Similarly, in *Folden* v. *Lobrovich* (1959) 171 Cal.App.2d 627 [341 P.2d 368], where a $2,400 deposit was made on a lease to become effective

about three months later if the lessee could secure leases on adjacent property, the court sustained a contention that "the provision for defendant's retention of the $2,400 constitutes neither a penalty nor liquidated damages, but rather that it is to be viewed as consideration for a right granted to plaintiffs to be relieved of their obligations under the contract should they not obtain leases on the other properties." (171 Cal.App.2d at p. 629.) In *Payne* v. *Pathe Studios, Inc.* (1935) 6 Cal.App.2d 136 [44 P.2d 598], the court rejected the contention that the employer could avoid paying an actress, ready, able and willing to work, her full compensation because it did not call her to work, on the theory that payment of the full compensation would be a penalty. (6 Cal.App.2d at pp. 141-142.)

■ Plaintiffs contend that the foregoing analysis ignores the express language of the commitment letter and the application. Both instruments refer to the $94,000 as a "stand-by deposit." The conditions of the application, which are incorporated into the commitment letter by reference, state: "Said deposit is to be returned when the loan is completed, but if the loan is not closed within the time to be agreed upon, said deposit shall be retained by you as liquidated damages . . . ."

"It is . . . well established that the form and name of an instrument are not controlling, for the law looks through the form to substance and gives effect to the intention of the parties. [Citations.] Thus, the express terms, such as 'option' or 'liquidated damages,' as used by the parties are not solely controlling of the interpretation of the agreement as executed." (*Welk* v. *Fainbarg, supra,* 255 Cal.App.2d 269, 272-273. See also *Folden* v. *Lobrovich, supra,* 171 Cal.App.2d 627, 629-630.)

. The fact that the deposit would be returned if the loan were made did not prevent the arrangement from being an option. The converse situation where the option deposit was to be applied on the purchase price if the option to purchase was exercised was considered in *Welk* v. *Fainbarg, supra.* There the court stated, "In the present case the evidence discloses the parties in part intended the $20,000 released from the escrow to be consideration for a 90-day escrow. The fact that it would also apply to the purchase price is not abhorrent to an option agreement, nor, standing alone, does it change an option agreement into a purchase agreement. [Citations.]" (255 Cal.App.2d at p. 276.)

Extrinsic evidence was taken by the lower court. Testimony was received which indicated that one purpose of the stand-by deposit was to

indicate the applicant's good faith, and to prevent him from shopping around for a more favorable commitment. Plaintiffs contend that it must therefore be assumed that the deposit was a penalty because it was designed to compel the applicant to take the loan offered by the optionor, and imposed a forfeiture if the applicant failed to do so. This argument is not worthy of consideration unless there was an obligation on the applicant to take the loan (see subpart B below), or unless the alternative open to the applicant, forfeiture of the deposit, was so unconscionable as to render the option concept suspect. (See *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 737 [108 Cal.Rptr. 845, 511 P.2d 1197, 63 A.L.R.3d 39]; 5 Williston, *op. cit.*, § 781, pp. 704-709; Sweet, *Liquidated Damages in California* (1972) 60 Cal.L. Rev. 84, 94 and 141.) Application of the latter doctrine presupposes that performance of the less onerous obligation was "the bargained-for performance." (See *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn., supra,* 9 Cal.3d at p. 738.) Here as we have seen there was no promise by the applicant to perform "the particular requirements" which would give rise to the company's obligation to disburse the loan funds. Plaintiffs' argument that it became bound to perform those requirements is examined below (subpart B).

■ In any event the evidence showed that the 2 percent stand-by deposit was a reasonable one for the consideration furnished by the financial institution. The cases reviewed above and below which deal with loan commitments reflect that shopping is done. Since a slight change in the interest rate over a 20- or 30-year loan can produce savings which will exceed the loss of a 1, 2 or 3 percent deposit, the inducement to pursue the original commitment is not completely compulsive.

In short the findings of the trial court with respect to the option are sustained factually and legally.

-B-

Plaintiffs suggest that the commitment letter may be construed as an offer to make a unilateral contract for a loan with their assignor's assent to be manifest by the performance of a series of acts, of which the deposit of a stand-by deposit was merely the first. They assert that on failure of complete acceptance by the assignor, it, and they as its assignees, are entitled to return of the $94,000 as money had and received or by way of restitution, apparently on the theory that the

insurance company was unjustly enriched because the assignor did not perform the other matters which would have led to the acceptance of the offer to make a loan. That analysis completely overlooks the conclusions set forth above, and the principle that the contract to keep the offer open is completely distinct from the contract which will be formed upon acceptance of the offer.

-C-

■ Plaintiffs, in an effort to bring the situation within the provisions of sections 1670 and 1671 of the Civil Code (see part II below), also contend that the commitment letter and their assignor's acceptance created a bilateral contract under which their assignor promised and became bound to perform the "particular requirements" set forth in the commitment letter, in addition to the deposit of the $94,000 stand-by deposit. This contention rests upon the doctrine of implied covenants.

In *Patty* v. *Berryman* (1949) 95 Cal.App.2d 159 [212 P.2d 937], the question was whether the instrument was merely an offer to buy or whether the seller had promised to sell. The court said: "If doubt existed as to whether the agreement was bilateral or unilateral, such doubt would have to be resolved by interpreting the agreement to be bilateral, thus protecting both parties, rather than unilateral, which would protect neither. There is a presumption in favor of interpreting ambiguous agreements to be bilateral rather than unilateral." (95 Cal.App.2d at p. 167.) In that case the court stated, "It is true that in the above document Berryman made all of the express promises, and that Patty made no express promise. But a promise to sell on the part of Patty is necessarily implied. The letter identifies the property to be purchased, fixes the purchase price and sets forth the terms of the proposed transaction in minute detail. Patty wrote 'accepted' on the letter and signed his name. What else could the term 'accepted' mean except that he agreed to the terms set forth, and necessarily agreed to sell on those terms?" (*Id.,* p. 166.) In this case an examination of the details of the transaction fail to show either that the prospective lender bargained for the performance of the conditions precedent to the actual making of the loan, or that the plaintiffs' assignor agreed to be bound to perform those conditions.

In *Cousins Inv. Co.* v. *Hastings Clothing Co.* (1941) 45 Cal.App.2d 141 [113 P.2d 878], the court reviewed numerous precedents where it had been contended that the terms of the agreement gave rise to a promise to perform that which was not expressly so phrased. The court concluded,

"Summarized, therefore, the rule deducible from the foregoing authorities controlling the exercise of judicial authority to insert implied covenants may be stated as follows: (1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract." (45 Cal.App.2d at p. 149. See also *Stockton Dry Goods Co.* v. *Girsh* (1951) 36 Cal.2d 677, 681 [227 P.2d 1, 22 A.L.R.2d 1460]. Cf. *Lippman* v. *Sears, Roebuck & Co.* (1955) 44 Cal.2d 136, 142 [280 P.2d 775].)

In this case there is no implication from the language used that plaintiffs' assignor was bound to take out a loan from the defendant company, much less that it was bound to perform all the other "particular requirements" which would give rise to the company's obligation to advance the funds. It is unnecessary to imply such a promise to carry out the intention of the parties, which clearly manifests a consideration of the contingency that the project would not go forward as contemplated, as was in fact the case. The agreement does not fall within any of the other criteria referred to above, principally because the subject of the failure to perform the conditions was completely covered by the contract.

The trial court did not err in failing to find a bilateral contract.

## II

In addition to finding that the sum of $94,000 paid by plaintiffs' assignor to defendant did not constitute liquidated damages, the court further stated:

"That with respect to the contention of plaintiffs, and each of them, that said standby deposit constituted liquidated damages, the Court finds:

"10. That defendant . . . in processing a loan commitment from its inception to and including the actual funding, cannot determine its actual damage in the event a prospective borrower does not accept the

loan because the work to be done by the defendant . . . in processing a loan commitment cannot be anticipated and can be predicted in a general way only.

"11. That the 2% standby deposit charged by defendant constitutes a reasonable attempt by defendant to ascertain in advance its loss in the event the loan to [plaintiffs' assignor] was not consummated.

"12. It was impracticable or extremely difficult for defendant to fix its actual damage in the event that said loan to [plaintiffs' assignor] was not consummated.

"13. It was in fact not possible for the defendant to ascertain its actual expense (damage) because records are not kept by the defendant from which the determination of such expense could be compiled."

Plaintiffs attack these findings in their opening brief on the theory that, as a bilateral contract, the agreement between the parties was subject to the provisions of sections 1670 and 1671 of the Civil Code,[1] and in their closing brief, in reliance upon *Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn., supra,* 9 Cal.3d 731, decided more than a year and one-half after the judgment appealed from, on the theory that the stand-by deposit was a penalty. Since the contract was an option, and there was no obligation on plaintiffs' assignor to exercise its right to take the loan, it is questionable whether the provisions of sections 1670, 1671 and of section 3275 of the Civil Code apply.

There is some suggestion that the provisions of sections 1670, 1671 and 3275 of the Civil Code might be applicable if the substance of the transaction, although cast in the terms of an option, was a penalty to coerce exercise of the option. Plaintiffs seek support for such a view in

[1]These sections provide:
"§ 1670. CONTRACT FIXING DAMAGES, VOID. Every contract by which the amount of damage to be paid, or other compensation to be made, for a breach of an obligation, is determined in anticipation thereof, is to that extent void, except as expressly provided in the next section."
"§ 1671. EXCEPTION. The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."
In addition section 3275 states: "RELIEF IN CASE OF FORFEITURE. Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty."

*Garrett* v. *Coast & Southern Fed. Sav. & Loan Assn., supra.* There the court stated, "The mere fact that an agreement may be construed, if in fact it can be, to vest in one party an option to perform in a manner which, if it were not so construed, would result in a penalty does not validate the agreement [fn. omitted]. To so hold would be to condone a result which, although directly prohibited by the Legislature, may nevertheless be indirectly accomplished through the imagination of inventive minds. Accordingly, a borrower on an installment note cannot legally agree to forfeit what is clearly a penalty in exchange for the right to exercise an option to default in making a timely payment of an installment. Otherwise the legislative declarations of sections 1670 and 1671 would be completely frustrated. *We have consistently ignored form and sought out the substance of arrangements which purport to legitimate penalties and forfeitures.* (See *Caplan* v. *Schroeder* (1961) 56 Cal.2d 515, 519-521 . . . ; *Freedman* v. *The Rector* (1951) 37 Cal.2d 16, 21-23 . . .)" (9 Cal.3d at p. 737, italics added. See also *Greenbach Bros., Inc.* v. *Burns* (1966) 245 Cal.App.2d 767, 770-771 and 772 [54 Cal.Rptr. 143]; Rest., Contracts, §§ 339 and 340; 5 Williston, *op. cit.,* §§ 775, 775A, 776-779, 781, 787-788 and 790, pp. 656-660, 669-695, 704-708, 714-733, 749-764 and 766; and Sweet, *op. cit.,* 60 Cal.L.Rev. 84, 90-94.) The omitted footnote points out that the court is referring to "a contracted-for alternative performance." (*Id.,* fn. 5.)

The simple answer is that here the company and plaintiffs' assignor did not contract for alternative performances; there was never any obligation on the latter to take the loan proffered by the insurance company. *Caplan* v. *Schroeder* and *Freedman* v. *The Rector,* on which the *Garrett* court relies permitted the defaulting purchaser of land to recover any excess of what he had paid in over the damages suffered by the vendor because of his default. (See 56 Cal.2d at pp. 518-521; and 37 Cal.2d at pp. 19-23.) In all three cases the party relieved had been bound, and the party charged had suffered damages that could be ascertained. The distinction between those cases and this was noted in *Caplan* v. *Schroeder, supra,* as follows: "In the present case plaintiffs did not secure an option to purchase or not as they pleased; they entered into a mutually binding contract that could be specifically enforced against them, and they executed and paid the note in part performance of that contract." (56 Cal.2d at p. 519.) The same thought is echoed in *Garrett,* where the court observed: "We recognize, of course, the validity of provisions varying the acceptable performance under a contract upon the happening of a contingency. We cannot, however, so subvert the substance of a contract to form that we lose sight of the bargained-for

performance. **Thus when it is** manifest that a contract expressed to be performed in **the alternative** is in fact a contract contemplating but a single, definite performance with an additional charge contingent on the breach of that performance, the provision cannot escape examination in light of pertinent rules relative to the liquidation of damages. [Citations.]" (9 Cal.3d at p. 738.) *Greenbach Bros., Inc.* v. *Burns, supra,* on which plaintiffs place great reliance is the subject of criticism which has pointed out the distinction between payment for an option (see *Welk* v. *Fainbarg, supra,* 255 Cal.App.2d 269) and a penalty. (See Sweet, *op. cit.,* 60 Cal.L.Rev. 84, 98. Note also, com. a, Rest., Contracts, § 340 at p. 558.)

The situation here may also be equated with *Blank* v. *Borden* (1974) 11 Cal.3d 963 [115 Cal.Rptr. 31, 524 P.2d 127], where the court concluded that the familiar withdrawal-from-sale provision in an exclusive-right-to-sell contract between an owner of real property and a real estate broker does not exact an unlawful penalty within the meaning of sections 1670 and 1671 of the Civil Code. The court observed, "We do not see in this arrangement the invidious qualities characteristic of a penalty or forfeiture. As indicated above, what distinguishes the instant case from other situations in which a form of alternative performance is used to mask what is in reality a penalty or forfeiture is the element of rational choice." (11 Cal.3d at p. 970.) In distinguishing the *Garrett* case the court added: "In the instant case, on the other hand, the contract clearly reserves to the owner the power to make a realistic and rational choice in the future with respect to the subject matter of the contract. Rather than allowing the broker to proceed with his efforts to sell the property, the owner, in the event that at any time during the term of the contract he changes his mind and decides not to sell after all, may withdraw the property from the market upon payment of a sum certain. In these circumstances the contract is truly one which contemplates alternative performance, not one in which the formal alternative conceals a penalty for failure to perform the main promise." (*Id.,* p. 971, fns. omitted.)

■ In any event the findings of the court are sustained by evidence which is sufficient to rebut plaintiffs' contrary assertions. If the stand-by deposit is to be considered as an amount agreed upon as the damage sustained by breach of some unestablished obligations of plaintiffs' assignor to complete the project and take out the loan, it must appear, as required by section 1671, that it was impracticable or extremely difficult to fix the actual damage. Plaintiffs assert that since all probable expenses and costs were within the knowledge of the defendant, there was at all times a readily ascertainable means of determining the amount of loss in

monetary figures as to each category of expense or cost. There might be some merit in that contention if the parties were to look backward after the 17- or 41-month period of the commitment expired, and the financial institution had secured a new borrower with whom to invest its funds. The record reflects that the prospective lender incurs expense, prior to approving the commitment, in reviewing and verifying the data in the application; after approval and until the completion of the project there is expense for continuous supervision and checking to insure that the conditions on which the loan is to be granted will be fulfilled;[2] during the period of the commitment there is a necessity to reserve future receipts for funding the loan, and if the loan is not consummated there is a prospective loss of income while a new source of investment is found, and expense is incurred in investigating a new application; and finally, if the money market has fluctuated there may be a loss of income over the term of the unconsummated loan.[3] The testimony indicated that it was impractical to allocate the expenses of the department charged with investing the company's funds in real estate loans to each particular application for a loan, but that the overall expense amounted to about 1.6 percent of the total amounts actually loaned out.

■ It is established that "the person relying on a liquidated damage provision has the burden of pleading and proving that *when the contract was entered into,* the fixing of damages was impracticable or extremely difficult." (*Chastain* v. *Belmont* (1954) 43 Cal.2d 45, 58 [271 P.2d 498]. See also *Feiger* v. *Winchell* (1962) 205 Cal.App.2d 123, 131 [22 Cal.Rptr. 901].) The finding of the trial court that it was impracticable or extremely difficult for defendant to fix its actual damage in the event the loan was not consummated is sustained by the record. Plaintiffs suggest that since the interest loss (or gain) would be ascertained when a new loan was made with equivalent funds, and since the company by the use of different cost accounting methods might have accounted for the costs of each application for which a commitment letter was issued, the finding should be reversed. In *Chastain* v. *Belmont, supra,* the trial court expressly found that the impracticability and difficulty in fixing damages

---

[2]The expense incurred by the lender in processing the application and the progress of the project during the commitment period, should be distinguished from the "direct costs" referred to in the application for the loan as the obligation of the borrower. The latter include payments to others such as escrow and recording fees and taxes.

[3]Testimony indicated that the interest to be received on the $4,700,000 loan over the contemplated 22-year period at 6½ percent would approximate $4,000,000. On that basis, if the insurance company could only invest the rejected funds at 6 percent, there would be a loss in excess of $300,000. It cannot be gainsaid that plaintiffs' assignor would rather lose his $94,000 than be liable for the former amount if the project fell through.

resulted from the insufficiency of the books and records kept by the party seeking the liquidated damages. (Cf. finding "13" above.) Another finding indicated that at all times it was and at the trial still was impracticable and difficult to fix the amount of damage and loss. The reviewing court found sufficient evidence to sustain the latter finding, and it noted with respect to the former finding, "Inasmuch as the time the contract is entered into is the material time so far as the validity of a provision for liquidated damages is concerned, the finding of the trial court would appear to be of no importance." (43 Cal.2d at p. 58.)

Plaintiffs contend that the amount fixed for liquidated damages must be reasonable. (*Greenbach Bros., Inc.* v. *Burns, supra,* 245 Cal.App.2d 767, 772. See also *Caplan* v. *Schroeder, supra,* 56 Cal.2d 515, 519-520 [15 Cal.Rptr. 145, 364 P.2d 321]; and *Freedman* v. *The Rector, supra,* 37 Cal.2d 16, 23 [230 P.2d 629, 31 A.L.R.2d 1].) Both the computation of the general expense and the evidence which shows that such deposits are customary in the negotiations for commercial long term loan on projects such as that contemplated by plaintiffs' assignor, sustain the court's finding that the 2 percent charge was reasonable. The fact that the financial institution was willing to refund the deposit so the borrower would enjoy the full fruits of the loan if it were consummated, does not render the retention of the stand-by deposit unconscionable when the loan is not made. The company may well be willing to write off its costs over the years against the $4 million interest to be received, and yet be unwilling to absorb them when no income is forthcoming.

In *Greenbach Bros., Inc.* v. *Burns, supra,* the court also applied the rule that "the amount agreed upon must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained. [Citations.]" (245 Cal.App.2d at p. 772.) Plaintiffs assert that the commitment letter should be treated as an adhesion contract and be strictly construed against the defendant company. (See Sweet, *op. cit.,* 60 Cal.L.Rev. 84, 85 and 87.) This seems to assume that the developers of a $4,700,000 project are babes who must be led by the hand through the woods of financial entanglements. It is inconceivable that such persons would not be cognizant of the practice of financial institutions to protect themselves by demanding such stand-by deposits, or in some cases, fees. The principles of the adhesion contract are not applicable. The developers were free to negotiate for a loan commitment on the terms offered by the defendant company, or to reject those terms. The fact that the parties did not discuss the possible actual damages to the prospective lender upon failure of the developer to

consummate the loan is of no importance if the amount fixed, even if in fact "liquidated damages" satisfied the tests reviewed above as found by the court.

There is an apparent contradiction between the statutory requirement that "from the nature of the case it would be impracticable or extremely difficult to fix the actual damage" (§ 1671), and the frequently pronounced requirement that "the amount agreed upon must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." (*Greenbach Bros., Inc. v. Burns, supra,* 245 Cal.App.2d at p. 772.) If it is impracticable or extremely difficult to fix the actual damage, how are the parties to estimate the fair average compensation for any loss that may be sustained? In *Greenbach* the court recognized that the matter was a, factual question, and it upheld an order of the trial court granting the depositing purchaser a new trial, stating, "We see nothing in the record before us to indicate that the parties here made any effort to estimate the actual damages that might be suffered by [the vendor] in the event of the [purchaser's] breach. . . . On this state of the record the trial judge could reasonably conclude that the amount of each deposit was arbitrarily arrived at and was not intended to represent damages." *(Id.)* In this case the court found to the contrary.

But is it necessary for the parties to bargain, or is it sufficient if the sum agreed upon is in fact reasonable in the light of all the circumstances? The cases relied upon in *Greenbach* do not in fact impose a higher standard. In *Dyer Bros. I. Wks. v. Central I. Wks.* (1920) 182 Cal. 588 [189 P. 445], the court upheld "a *penalty*" for the violation of an employer's agreement to jointly resist, settle or arbitrate the demands of their employees which was measured by the gross business transacted by the respective parties. The court stated, "Looking to the entire agreement, its scope, purpose, and subject matter, and considering the result of a breach and the reasonableness of the sums agreed to be paid therefor, it is clear that there was an intent to estimate a just compensation for the loss sustainable in the event of a failure to comply with the agreement." (182 Cal. at p. 593.)

In *Rice v. Schmid* (1941) 18 Cal.2d 382 [115 P.2d 498, 138 A.L.R. 589], the court held that the existence of a market, for the flour which the bakery buyer refused to accept from a wholesale flour merchant, in which prices were quoted each day, precluded reliance upon a contract provision for liquidated damages. The court refrained from deciding

whether under other circumstances such a provision would be valid, and noted, on the basis of the case last cited, "A valid liquidated damage clause must, of course, represent a reasonable endeavor by the parties to estimate fair compensation for the loss sustained." (P. 386.) By reference to general use of the agreement involved between millers or manufacturers of flour and buyers, and its established validity in other states, the court appeared to indicate that as to such parties there would be the requisite endeavor.

In *Caplan* v. *Schroeder, supra,* the validity of the provision was noted to be a factual one on which there was a dearth of pleading or proof with respect to the elements of valid liquidated damages. (56 Cal.2d at pp. 519-521.) The court observed, "There was other evidence, however, that the value of the land was expected to increase with the passage of time. It might be inferred therefrom that the parties did not contemplate that defendants would suffer any damages if they were subsequently required to resell their property and that therefore the amount of the note did not represent a reasonable endeavor to estimate the probable damages in the event of plaintiffs' breach. [Citations.]" (*Id.,* at p. 520. See also *McCarthy* v. *Tally* (1956) 46 Cal.2d 577, 584 and 586 [297 P.2d 981].)

In *Better Food Mkts.* v. *Amer. Dist. Teleg. Co.* (1953) 40 Cal.2d 179 [253 P.2d 10, 42 A.L.R.2d 580], the rule quoted above from *Dyer Bros. I. Wks.* and *Rice* v. *Schmid* was analyzed from the viewpoint of its effectiveness in limiting liability of the party who failed to perform the contract. The court stated, "It has been suggested that the greater the difficulty encountered by the parties in estimating the damages which might arise from a breach, the greater should be the range of estimates which the courts should uphold as reasonable. (5 Corbin on Contracts, § 1059, p. 291.) ▮ The plaintiff's contention that the agreed amount did not represent an endeavor by the parties to estimate the probable damage is based on evidence that the liquidation clause was part of the printed material in a form contract generally used by the defendant in dealing with subscribers such as the plaintiff, and that the defendant did not investigate the plaintiff's manner of conducting its business or the character and value of its stock. Nevertheless the parties agreed to the liquidation provisions, and there is no evidence that they were not fully aware of circumstances making it desirable that liquidated damages be provided for. . . . [¶] [I]t is clear that the actual loss resulting from a breach could in many cases be less than the amount provided for. It is equally clear that in many other cases the actual loss would exceed that amount. To construe this as a penalty it would have to be said that the

amount provided to be paid bore no reasonable relation to the losses the parties thought might be sustained. This may not rightly be stated." (40 Cal.2d at p. 187. See also *Atkinson* v. *Pacific Fire Extinguisher Co.* (1953) 40 Cal.2d 192, 196 [253 P.2d 18]; and *Feary* v. *Aaron Burglar Alarm, Inc.* (1973) 32 Cal.App.3d 553, 557-558 [108 Cal.Rptr. 242].)

The principles last quoted are governing here. It was not necessary for the prospective lender to review all of its possible damages with the applicant. There is no evidence to show that the assignor was not aware of the circumstances making it desirable to provide for some compensation to the financial institution if the loan were not taken. The evidence shows that the sum bears a reasonable relationship to the expenses and damages the lender would incur. In the exercise of its business judgment the applicant-assignor accepted the terms offered by the financial institution. There is sufficient evidence of agreement.

Finally, plaintiffs insist that the deposit was a penalty because admittedly one of the reasons, among many, for which it was exacted was to demonstrate the good faith of the applicant and to deter the applicant from shopping around for another loan. How effective a 2 percent penalty might be if there was a significant drop in the interest rate is questionable. (See fn. 3 above.) In any event, the fact that the deposit may have incidental consequences influencing action by the depositor, would not render it invalid if it is warranted on other grounds.

It is concluded that the alternative findings of the trial court should also be sustained and that there is no merit in plaintiffs' contentions that as a matter of law they are entitled to a return of the deposit made by their assignor as either a penalty or any other form of prohibited liquidated damages. These conclusions are fortified by decisions in those jurisdictions where similar contentions have been made in connection with deposits or fees received and retained by financial institutions for loan commitments.[4]

[4]See: *Shel-Al Corporation* v. *American National Insurance Co.* (5th Cir. 1974) 492 F.2d 87; *In re Four Seasons Nursing Centers of America, Inc.* (10th Cir. 1973) 483 F.2d 599; *Regional Enterprises* v. *Teachers Insurance & Annuity Assn.* (9th Cir. 1965) 352 F.2d 768; *Chambers & Company* v. *Equitable Life Assurance Soc.* (5th Cir. 1955) 224 F.2d 338; *Franks Nursery Sales, Inc.* v. *American Nat. Ins. Co.* (E.D.Mich. 1974) 388 F.Supp. 76; *White Lakes Shop. Ctr.* v. *Jefferson Stand. L. Ins. Co.* (1971) 208 Kan. 121 [490 P.2d 609]; *Goldman* v. *Connecticut General Life Insurance Co.* (1968) 251 Md. 575 [248 A.2d 154]; *Paley* v. *Barton Savings & Loan Assn.* (1964) 82 N.J.Super. 75 [196 A.2d 682]; *Boston Road Shopping Ctr.* v. *Teachers Ins. & Annuity Assn.* (1961) 13 App.Div.2d 106 [213 N.Y.S.2d 522], affd. (1962) 11 N.Y.2d 831 [227 N.Y.S.2d 444, 182 N.E.2d 116];

### III

At the pretrial conference the plaintiffs demanded a jury for the consolidated trial and the defendant indicated it desired a jury if plaintiffs waived their rights. The case commenced before a jury and so continued until plaintiffs rested. Defendant interposed a motion for a nonsuit which was denied. It was then stipulated and ordered that the jury be discharged. Defendant attempted to challenge the court for cause, and moved for a mistrial. The challenge and motion were denied.

In ruling on the motion for a nonsuit the court stated, "Now the Court is of the opinion that the provision in the agreement with respect to the right of the proposed lender to retain the deposit as liquidated damages is void under Section 1670 of the Civil Code; and that the burden of proving any damages for any breach would be on the part of the defendant insurance company. And the motion for non-suit is denied." Thereafter, the attorney for the defendant remonstrated with the court. In the course of that discussion he stated, ". . . I don't think that the posture of this case is such that if 1670 becomes applicable as a matter of law, I submit that the Court can't make that application yet until you have heard our evidence." The court replied, "No, I'm only determining the motion for nonsuit." Nevertheless, thereafter the following occurred: "[Defendant's attorney]: I don't know what the issues are but I assume that they are going to be confined solely to 1670 or 1671. The Court: To my understanding, yes. Do you agree? [Assignor's attorney]: Yes. [Lowe's attorney]: Yes, your Honor." Throughout, however, the court recognized the defense contention that there was no obligation on plaintiffs' assignor to exercise the loan.[5]

*Continental Assur. Co.* v. *Van Cleve Bldg. & Const. Co.* (Mo.App. 1953) 260 S.W.2d 319. See also *St. Joseph Professional Bldg. Co.* v. *New York Life Ins. Co.* (Tex.Civ.App. 1970) 449 S.W.2d 848 (decided in favor of lender on other grounds). Cf. *Tri-Cities Const., Inc.* v. *American Nat. Ins. Co.* (Tex.Civ.App. 1975) 523 S.W.2d 426 (summary judgment for prospective lender reversed).

[5] The reported discussion concluded as follows: "[Defendant's attorney]: Will you instruct the jury that there was no breach? The Court: I will give them the instruction, I will read to them the instruction to the effect that [the assignor] was not obligated to exercise the loan. [Defendant's attorney]: I can argue that, then? The Court: You can argue that, yes. [Defendant's attorney]: And 1670 has no application? The Court: Oh, I don't care what you argue on the facts, you argue any way you want, but on the law I don't want you to argue as to the law. [Defendant's attorney]: Can I make an argument that the Court will instruct that there was no obligation breached? The Court: Well, I will tell you what we had better do, then. Prepare your respective instructions and we will go over them together. Then we'll decide what instructions will be given or won't be given, and then any instruction that will be given you will be able to argue."

After the noon recess plaintiffs waived a jury. After his challenge and motion were denied the defendant's attorney joined in the waiver and the trial proceeded accordingly. At the conclusion of the case one of the counsel for the assignees stated, "As I recall, it is my understanding that you have agreed and stated that 1670 is already applicable." The court replied, "Well, I denied the motion for non-suit that was urged on those grounds, but now that it is closed I would like to hear from both sides on all of those points. I did deny the motion for a non-suit, yes. [¶] I am inclined to the view that 1670 is involved in this case and I think if you would help me on those points I have outlined, I would appreciate it."

In a declaration in support of their motion for a new trial, the attorney for Lowe stated, "Several statements made by the trial judge during arguments with respect to defendant's motion for non-suit, led plaintiff's counsel to believe that dismissal of the jury would be a prudent move for the reason that if the judge was required to rule on the case, he would rule in favor of the plaintiffs. The various statements made by the trial judge tacitly implied a judgment in favor of plaintiffs. . . . It was an abuse of discretion for the trial judge to infer to the lawyers for plaintiffs that he would decide the case in their favor and, therefore a great deal of time would be saved if the jury was released."

Plaintiffs' contention rests on the principle that the trial court abused its discretion in failing to grant them a new trial for irregularity in the proceedings of the court by which they were prevented from having a fair trial. (Code Civ. Proc., § 657, subd. 1.) In *Gay* v. *Torrance* (1904) 145 Cal. 144 [78 P. 540], the court observed: "The language of the statute is sufficiently broad to include any departure by the court from the due and orderly method of disposition of an action by which the substantial rights of a party have been materially affected, where such departure is not evidenced by a ruling or order that may be made the subject of an exception. It may of course be freely conceded that the 'personal habits, conduct, deportment, or statements of the judge,' having no relation to or effect on the disposition of the cause, are not the proper subject of complaint upon a motion for a new trial. The question always is as to whether the acts were of such a nature, and done under such circumstances, as to afford reasonable grounds for the conclusion that by reason thereof the defeated party has not had a fair and impartial trial." (145 Cal. at pp. 149-150.)

In *Shippy* v. *Peninsula Rapid Transit Co.* (1925) 197 Cal. 290 [240 P. 785], the court upheld an order granting a new trial where the judge who

had tried the case improperly interrogated the jury and determined that 10 jurors would decide the case without argument, after counsel for one party had indicated that he was willing to submit the case without argument, and opposing counsel had requested argument. Opposing counsel then, after taking an exception, waived argument and asked that the jury be instructed. The court concluded, ". . . the conduct of the trial judge in thus improperly interrogating the jury and in thereby bringing about the unwilling consent of plaintiff's counsel to submit the cause without argument constituted a serious and prejudicial irregularity fully sufficient to justify the granting of plaintiff's motion for a new trial based thereon." (197 Cal. at pp. 295-296.) In *Pratt* v. *Pratt* (1903) 141 Cal. 247 [74 P. 742], the court found an abuse of discretion in denying a new trial where the defendant withdrew a witness after the court by its remarks "virtually threatened to prejudge the testimony of the defendant [who offered his daughter as a witness] as a witness, and intimated that unless the daughter was withdrawn as a witness he would regard the fact of her having contradicted the mother in the father's interest as a matter seriously discrediting the latter's testimony." (141 Cal. at pp. 251-252. See also *Shippey* v. *Shippey* (1943) 58 Cal.App.2d 174, 177-178 [136 P.2d 86].)

Aside from what appears to be a studied intent to waive a jury, plaintiffs have not shown any prejudice to themselves by their reliance on the court's remarks. They were made during the course of the trial before all the evidence was in. If the ruling was erroneous, because the agreement was an option as a matter of law, the plaintiffs had no vested interest in the perpetuation of error. The matter could have been corrected by motion for new trial or appeal even in the event of a favorable jury verdict. If the ruling were correct on the evidence then before the court, the plaintiffs had no right to assume that the court would adhere to it irrespective of what evidence might be produced by the defendant. The situation is governed by *Gary* v. *Avery* (1960) 178 Cal.App.2d 574 [3 Cal.Rptr. 20], where the court stated: "The duty of a trial judge differs from that of a juror with respect to expressing an opinion on any subject of the case before its submission. Some trial judges advise their young associates that they can save themselves reversals by keeping their mouths shut; and so they can. But avoiding reversals should not be sought at the expense of a fair trial, and often the latter requires an expression of the conclusions of the trial judge up to the moment, in order that counsel may be advised what course to chart. Such expressions *may* indicate that the judge's mind is closed, further evidence will not be given any effect, but that is not necessarily the

inference always to be drawn from the expressions of present impressions." (178 Cal.App.2d at p. 579. See also *Gardner* v. *Mobil Oil Co.* (1963) 217 Cal.App.2d 220, 222 and 225 [31 Cal.Rptr. 731, 6 A.L.R.3d 1451].)

Insofar as plaintiffs' complaint is predicated on matters which are not in the record, it cannot be considered. "Statements of counsel in briefs are not part of the record on appeal. [Citations.] The question whether the trial court was biased must therefore be determined from matters appearing in the reporter's transcript." (*Gantner* v. *Gantner* (1952) 39 Cal.2d 272, 278 [246 P.2d 923]. See also *Oldenkott* v. *American Electric, Inc.* (1971) 14 Cal.App.3d 198, 207 [92 Cal.Rptr. 127] [cert. den. (1971) 402 U.S. 975 (29 L.Ed.2d 140, 91 S.Ct. 1668)]; and 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 218, pp. 4208-4209. Note *Gardner* v. *Mobil Oil Co., supra,* 217 Cal.App.2d at pp. 221 and 222.)

There was no abuse of discretion in denying the plaintiffs' motion for a new trial on the ground of irregularity in the proceedings of the court.

IV

Plaintiffs' further contention that the evidence is insufficient to sustain the decision and judgment, and that the trial court abused its discretion in failing to grant a new trial on that ground (Code Civ. Proc., § 657, subd. 6), admittedly rests on the matters considered above in parts I and II. It must therefore similarly fail.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.